**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| DANIEL A. MELOCHE, ADRIÁ BOTIFOLL, STUART JAY, and OLIVIER CONDEMINE, derivatively on behalf of VEREIT, INC. | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:16-cv-03366-ELH |
| v. | ) ) | |
| NICHOLAS S. SCHORSCH; DAVID KAY; LESLIE D. MICHELSON; EDWARD G. RENDELL; WILLIAM G. STANLEY; BRUCE FRANK; SCOTT BOWMAN; WILLIAM KAHANE; EDWARD M. WEIL, JR.; BRIAN BLOCK; LISA MCALISTER; SCOTT SEALY; LISA BEESON, and GRANT THORNTON, LLP, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| VEREIT, INC., formerly known as AMERICAN REALTY CAPITAL PROPERTIES, INC. | ) ) ) | |
| Nominal Defendant. | ) | |

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ............................................................................1

II.     JURISDICTION AND VENUE ......................................................................7

III.    THE PARTIES.................................................................................................7

IV.     OFFICER AND DIRECTOR DEFENDANTS' DUTIES.................................13

V.      SUBSTANTIVE ALLEGATIONS ................................................................18

VI.     DAMAGES TO AMERICAN REALTY ........................................................83

VII.    DEMAND REFUSED ALLEGATIONS ........................................................84

VIII.   CAUSES OF ACTION....................................................................................91

4840-9062-2784, v. 1

## VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Daniel A. Meloche, Adriá Botifoll, Stuart Jay, and Olivier Condemine ("Plaintiffs") derivatively on behalf of Vereit, Inc. ("Vereit"), by and through their undersigned attorneys, hereby submit this Verified Amended Shareholder Derivative Complaint (the "Complaint"). Plaintiffs allege the following based upon the investigation of Plaintiffs' undersigned proposed lead counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Nominal Defendant Vereit, Inc., formerly known as American Realty Capital Properties, Inc., ("American Realty", "ARCP" or "Company")[1], as well as reports, press releases, pending criminal and civil litigation, and other public statements issued by the Company.

## I.    NATURE OF THE ACTION

1.     This is a shareholder derivative action, brought for the benefit of American Realty, against certain former members of its Board of Directors (the "Board") and executive officers, as a result of a multi-year illegal accounting scheme and blatant cover-up. Plaintiffs sufficiently allege a systemically corrupt culture at the Company which resulted in the Company's admission that its financial statements were intentionally falsified and its reported operating performance was materially false for ***every reporting period from its September 2011 Initial Public Offering ("IPO") through 2Q2014***. It is also an action against Grant Thornton, LLP ("Grant Thornton"), the Company's auditor during the events constituting the illegal wrongdoing alleged herein, for negligence, breach of contract and accounting malpractice described herein. While serving as

---

[1]      American Realty changed its name to Vereit, Inc. in July 2015.

4840-9062-2784, v. 1

ARCP's auditor, Grant Thornton received millions of dollars in payments from ARCP and other related entities.

2.      The Company is currently facing massive exposure as a result of a multi-year illicit accounting scandal and cover-up that resulted in a criminal investigation by the Federal Bureau of Investigation ("FBI") and the United States Attorney's Office.   On September 8, 2016, U.S. prosecutors announced criminal fraud charges against the Company's former Chief Financial Officer ("CFO"), Brian Block ("Block") and Lisa McAlister ("McAlister"), the Company's former Chief Accounting Officer ("CAO").   Block was arrested and charged with six criminal counts, including securities fraud, conspiracy and making false statements.   McAlister pleaded guilty on June 29, 2016 to four criminal counts, including securities fraud and conspiracy.

3.      Additionally, other state and federal regulators have filed actions against the Company and the Company has also been named as a defendant in several securities fraud class action lawsuits against the Company and numerous senior executives.   Despite these facts, the Board took no action and, as described in detail herein, failed to adequately respond to Plaintiffs' litigation demand.   This clearly demonstrates the lack of business judgment on behalf of the Board, which did nothing to protect the Company and limit its massive exposure.

4.      The Company lies at the center of a complex web of interconnected companies devised by its former Chief Executive Officer ("CEO"), Nicholas Schorsch ("Schorsch").   Schorsch founded more than 25 companies in the real estate, financial advisory, oil and gas exploration and small business lending fields, and became known as a prolific dealmaker.   Through several complex related-party transactions with Schorsch's controlled entities fueled by an illegal accounting scheme, American Realty raised capital via different equity offerings and embarked on a rapid acquisition spree in order to raise capital.

5.      As a result of the Company's acquisition-centric growth strategy, the Company was under extreme pressure to meet aggressive financial standards such as its adjusted funds from operations ("AFFO"), a key metric used by investors and analysts to gauge real estate investment trusts ("REIT"), which would enable the Company to raise capital more easily.  AFFO -- a non-United States Generally Accepted Accounting Principles ("GAAP") measure which REIT industry groups support for use in communications to stakeholders and financial disclosures – is essentially the REIT industry's equivalent for earnings.[2]

6.      Throughout ARCP's growth period (2011 through 2014), ARCP assured investors that its internal controls were effective and that its financial statements were accurate and could be trusted.  Analysts and investors relied on those representations, devoting particular attention to the Company's reported AFFO.  ARCP stressed its AFFO figure to investors from its September 2011 IPO through the Second Quarter 2014.  ARCP stated that AFFO provided a basis upon which investors could "assess the sustainability of our operating performance."

7.      Each quarter, ARCP touted its AFFO, which regularly exceeded analysts' estimates and outmatched its competitors.  For example, on August 1, 2012, ARCP reported AFFO for the third quarter of 2012; it was over 100% greater than the AFFO ARCP had reported for the second quarter of that year.  On May 6, 2013, ARCP reported AFFO of nearly $31 million for the first quarter of 2013, an 811% increase from the prior quarter.  On November 7, 2013, ARCP reported AFFO of $47 million for the third quarter of 2013, a 42% increase from the prior quarter.  On February 27, 2014, the Company reported record financial results, with a fourth quarter AFFO of $56 million, dwarfing analysts' estimates and more than 150% greater than the corresponding prior year period.  On May 8, 2014, the Company reported a record-high AFFO of $147 million for the

---

[2]      *See* article entitled, "Meet Alternative Investing's Slick New King, Billionaire Nick Schorsch," published by *Forbes.com* on October 29, 2014.

first quarter of 2014, which was 330% greater than what it had reported for the same period in 2013.  Finally, on July 29, 2014, the Company reported yet another record-high AFFO of $205 million for the second quarter of 2014, which was 429% greater than what it had reported for the same period in 2013.   Analysts and investors applauded the Company for the purportedly exceptional results, calling ARCP "one of the most compelling investment opportunities across the REIT sector."

8.      Ultimately, the Company was forced to admit that its previously reported first quarter of 2014 AFFO and second quarter of 2014 AFFO had been falsified.  ARCP further revealed that not only had senior Company executives been aware of the falsity of ARCP's financial statements, but they had also allowed those false financial statements "*to be filed without completing an analysis of the errors*."  Even more troubling, the Company admitted that the falsification of its first quarter 2014 Form 10-Q was "*intentionally not corrected*," and that "*other AFFO and financial statement errors were intentionally made*."  That is, the Company's second quarter 2014 AFFO was falsified to cover up prior false statements.

9.      Contrary to representations made to investors, and from the very beginning of its history as a public company, ARCP lacked an adequate system of controls over its financial reporting.  ARCP's financial statements were riddled with errors that served not only to mask its faltering performance but to make that performance appear exceptional.

10.     The Company ultimately revealed that investors could no longer rely upon its previously reported financial results for fiscal year 2013 ("FY13"), 1Q14 and 2Q14, and further indicated that the accounting scheme had been perpetrated by CFO Block and CAO McAlister, whom the Company claimed to have asked to resign, though McAlister claims she was fired.  Both Block and McAlister had key roles in preparing the Company's erroneous financial statements.

4840-9062-2784, v. 1

11.     On December 14, 2014, the upheaval of senior management continued as additional details of the illegal accounting scandal came to light.  Three of the Company's senior executives resigned on the same day – Schorsch, David Kay ("Kay") (who had recently taken over as CEO), and Chief Operating Officer ("COO") Lisa Beeson ("Beeson"), who had recently taken over as President.

12.     Despite the fact that the Company's Audit Committee's investigation ultimately revealed that financial errors were "intentionally made" and "intentionally not corrected", the Board allowed several senior executives to voluntarily resign and collect hefty compensation packages instead of firing them immediately with cause.  Notably, despite the criminal wrongdoing that occurred, the Board allowed the indemnification agreements of Schorsch, Kay, Beeson, McAlister and Block to remain in full force and effect, thereby obligating the Company to pay potentially millions of dollars to defend them in regulatory investigations and related litigation.  Clearly, the Board put the interests of the individuals, who unquestionably damaged the Company, ahead of the best interests of the Company and its shareholders.

13.     Ultimately, on March 2, 2015, additional revelations of the illegal scheme came to light when the Company was forced to admit that it had falsified its reported operating performance and/or financial statements for each and every reporting period since it went public in 2011.  The Company also disclosed that its internal control over financial reporting and its disclosure control and procedures were not effective due to certain material weaknesses.  Additionally, the Company admitted that the "material weaknesses had not been remediated, and additional weakness in [its] internal control over financial reporting existed, at March 31, 2014, June 30, 2014 and September 30, 2014" and that its "disclosure controls and procedures were not effective."  The March 2015 announcement also revealed that AFFO reported in the Company's SEC filings was overstated for

fiscal year 2011, fiscal year 2012, fiscal year 2013 (including each fiscal quarter of 2013), and the first two fiscal quarters of 2014.

14.     Throughout the wrongdoing, Defendants allowed the Company to make materially false and misleading statements regarding the Company's business as well as operational and compliance policies.

15.     Defendants' conduct here is the very definition of extreme recklessness and gross negligent conduct, which resulted in massive damages for American Realty and its stockholders while management and the Board continued to reap undeserved compensation.   As a result of Defendants' illegal scheme, approximately $4 billion of the Company's market value was wiped out in 2014 as evidenced in the chart below:



16.     Plaintiffs bring this derivative action to: (a) recoup damages against Defendants for the benefit of the Company; and (b) require the Company to reform and improve its corporate governance and internal procedures to protect American Realty and its shareholders from a repetition of the damaging events described below.

6

## II.   JURISDICTION AND VENUE

17.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934.[3] This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

18.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because during the wrongdoing alleged herein ARCP maintained its principal place of business in this District, one or more of the individual defendants resides in or maintains executive offices in this District, a substantial portion of the transactions complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.   THE PARTIES

### A.   Plaintiffs

19.   *Plaintiff Daniel A. Meloche* ("Meloche") is a current shareholder of American Realty and has continuously held American Realty stock at all relevant times.

20.   *Plaintiff Adriá Botifoll* ("Botifoll") is a current shareholder of American Realty and has continuously held American Realty stock at all relevant times.

21.   *Plaintiff Stuart Jay* ("Jay") is a current shareholder of American Realty and has continuously held American Realty stock at all relevant times.

---

[3] Although Plaintiffs believe they have adequately pled the necessary jurisdictional predicate for this Court to hear the matter in controversy, if the Court subsequently determines additional allegations are necessary to plead diversity jurisdiction, Plaintiffs will respectfully seek to leave to do so.

4840-9062-2784, v. 1

22.     ***Plaintiff Olivier Condemine*** ("Condemine") is a current shareholder of American Realty and has continuously held American Realty stock at all relevant times.

### B.     Nominal Defendant

23.     Nominal Defendant American Realty is a Maryland corporation with its principal executive offices located at 2325 E. Camelback Road, Suite 1100, Phoenix, AZ.   American Realty's common stock trades on the NASDAQ under the ticker symbol "ARCP".   American Realty is a leading, self-managed commercial REIT focused on investing in single tenant freestanding commercial properties subject to net leases with high credit quality tenants.   American Realty owns approximately 4,400 properties totaling 99.1 million square feet of leasable space. Additionally, American Realty acquires and manages assets on behalf of the Cole Capital® ("Cole") non-traded REITs, managing nearly $30 billion of high-quality real estate located in 49 states, as well as Washington D.C., Puerto Rico and Canada.

### C.     Board Defendants

24.     ***Defendant Schorsch***  is the co-founder of American Realty.   Schorsch served as the Company's CEO since its inception until his resignation effective October 1, 2014.   On December 12, 2014, the Company announced Schorsch's resignation as a director, Chairman of the Board and his positions on the board of over 15 non-traded REITs managed by Cole.   Schorsch also served and/or continues to serve as an officer and/or director at numerous related entities.

25.     ***Defendant Kay*** was appointed President of the Company on November 25, 2013, effective December 16, 2013.   Effective October 1, 2014, Kay was appointed CEO and director, at which time Beeson was appointed as President.   On December 15, 2014, the Company announced that Kay had "stepped down" as the Company's CEO, as well as from its Board.

26.     ***Defendant Edward M. Weil*** ("Weil") served as ARCP's Executive Vice President and Secretary of the Company since its formation in December 2010 until March 1, 2012, when

8

he was appointed President, COO, Treasurer and a member of the Board.  In December 2013, Weil ceased functioning as an executive officer of the Company.  Weil resigned from the Company's Board on June 24, 2014.  Weil served as a director during the period that false statements were disseminated to the Company's shareholders.  Weil currently serves or has served in various positions with other entities related with Schorsch, including but not limited to, American Financial Realty Trust ("AFRT"), American Realty Capital Global Trust, Inc. ("GNL"), American Realty Capital Healthcare Trust II, Inc. ("HTI"), American Realty Capital Healthcare Trust, Inc. ("HTC"), American Realty Capital New York City REIT, Inc. ("ARC NYCR"), ARC Realty Finance Trust, Inc. ("ARC RFT"), American Realty Capital Trust, Inc. ("ARCT"), New York REIT, Inc. ("NYRT"), RCS Capital Corporation ("RCAP"), RCS Capital Management ("RCS Capital Mgmt."), ARC Grocery Center REIT II, Inc. ("PE-ARC II"), American Realty Capital Trust III, Inc. ("ARCT III"), American Realty Capital Trust IV, Inc. ("ARCT IV"), and American Realty Capital — Retail Centers of America, Inc. ("ARC RCA").

27.     ***Defendant William Stanley*** ("Stanley") was announced as a director on October 21, 2013, effective as of the closing of the ARCT IV merger in January 2014 (the "ARCT IV Merger").  Stanley was the Chairman of the Nominating and Corporate Governance Committee and a member of the Audit and Compensation Committees during the wrongdoing alleged herein. Stanley was appointed interim CEO and Interim Chairman of the Board on December 15, 2014. On March 10, 2015, the Board appointed a new CEO, effective April 1, 2015, replacing Stanley as Interim CEO.  Since 2008, Stanley has served in various positions with other entities related with Schorsch, including but not limited to, Business Development Corporation of America ("BDCA"), Business Development Corporation of America II ("BDCA II"), ARC RCA, NYRT, ARCT, ARCT IV. Furthermore, an article published on December 15, 2014 in the *Wall Street*

9

*Journal* that reported on Schorsch's resignation noted Stanley "worked for years as a financial adviser to Mr. Schorsch's late father." Defendant Stanley was appointed Interim CEO and Interim Chairman of the Board from December 15, 2014 through March 31, 2015. For his role as Interim CEO, Stanley was compensated $150,000 a month.

28. ***Defendant Edward G. Rendell*** ("Rendell") was re-appointed as a director in February 2013 and served until his resignation effective April 1, 2015. Rendell previously served as a director of the Company from July 2011 until October 2012. During his tenure on the Board, Rendell served as a member of the Audit, Compensation, and Nominating and Governance Committees. Since 2010, Defendant Rendell is serving or has served in various positions at several of Schorsch's entities, including but not limited to, BDCA, BDCA II, ARCT III, ARC RCA, and American Realty Capital Daily Net Asset Value Trust, Inc. ("ARC DNAV").

29. ***Defendant Bruce Frank*** ("Frank") has served as a director since July 2014. On December 15, 2014, Frank was appointed as the Chairman of the Audit Committee and was considered an "audit committee financial expert." Frank also serves as a member of the Compensation Committee.

30. ***Defendant Leslie D. Michelson*** ("Michelson") served as a director from October 2012 until his resignation effective April 1, 2015. During his tenure on the Board, Michelson served as Chair of the Audit Committee until Frank was appointed as Chairman on December 15, 2014. Michelson was a member of the Nominating and Governance Committee. Michelson previously served on the Compensation Committee during the year ended December 31, 2013. Since 2009, Defendant Michelson has served in various positions at several of Schorsch's entities, including but not limited to, ARC RFT, BDCA, ARC RCA, NYRR, ARCT, ARC DNAV, ARCT III.

31.     ***Defendant Scott Bowman*** ("Bowman") was appointed as a director in February 2013 and resigned from the Board in September 2014.  During his tenure on the Board, Bowman was a member of the Audit, Nominating and Governance, and Compensation committees.   Since 2011, Bowman has served in various positions at several of Schorsch's entities, including but not limited to, ARCT III and NYRR.

32.     ***Defendant Scott Sealy*** ("Sealy") was appointed to the Board in February 7, 2014 after the Cole merger.  Sealy previously served as a director of Cole.  Sealy resigned from the Board on June 10, 2014.

33.     ***Defendant William M. Kahane*** ("Kahane") was a member of ARCP's Board of Directors from ARCP's formation until March 2012, and then again from February 2013 until June 24, 2014, when he resigned from the Board.  Between November 2010 and March 2012, Kahane was the President, COO and a beneficial owner of ARC Advisors.  Kahane was also the co-founder of AR Capital.  Kahane was a beneficial owner of, and served as the President and COO, of RCS Capital (aka RCAP Holdings).

34.     Defendants Schorsch, Kay, Weil, Stanley, Rendell, Frank, Michelson, Bowman, Kahane and Sealy shall collectively be referred to herein as "Director Defendants" or the "Board".

**D.     Officer Defendants**

35.     ***Defendant Lisa Beeson*** ("Beeson") was appointed the Company's COO effective November 8, 2013.  Beeson was appointed President effective on October 1, 2014.  Beeson resigned from both positions on December 15, 2014 in connection with the illegal accounting scandal.

36.     ***Defendant Block*** served as the Company's CFO and Executive Vice President since the Company's inception in December 2010 and was appointed as its Treasurer and Secretary effective December 2013.  Block abruptly resigned on October 28, 2014 in connection with the

illegal accounting scandal. Since 2008, Block has served in various positions with other entities related with Schorsch, including but not limited to, RCAP, ARC Advisors, ARCT III, and ARCT IV. According to the Company's SEC filings, Block was previously responsible for the accounting, finance and reporting functions at the ARCP group of affiliated companies.

37.   **Defendant McAlister** served as the Company's CAO and Senior Vice President from her appointment effective November 8, 2013 until her separation from employment on October 28, 2014 in connection with the illegal accounting scandal.

38.   Defendants Schorsch, Kay, Weil, Stanley, Block, McAlister, Rendell, Frank, Michelson, Bowman, Sealy, and Beeson shall collectively be referred to herein as "Defendants."

### E.   Auditor Defendant

39.   Grant Thornton is a limited liability partnership based in Chicago, Illinois, with offices at 757 Third Avenue, 9th Floor, New York, NY 10017. Grant Thornton has had a long-standing relationship with ARCP since at least 2007 and has audited at least 27 Schorsch-related entities over that period.[4] At the beginning of 2014, Grant Thornton was the auditor for approximately 17 Schorsch-related entities, generating millions of dollars in fees until it was terminated by the Company in June 2015. Grant Thornton certified the Company's FY12 and FY13 financial statements, which were restated on March 2, 2015 due to intentional misstatements

---

[4]   Other Schorsch-related entities that Grant Thornton audited include: American Energy Capital Partners, LP; American Realty Capital – Retail Centers of America, Inc.; American Realty Capital – Retail Centers of America II, Inc.; American Realty Capital Daily Net Asset Value Trust, Inc.; American Realty Capital Global Trust, Inc.; American Realty Capital Global Trust II, Inc.; American Realty Capital Healthcare Trust, Inc.; American Realty Capital Healthcare Trust II, Inc.; American Realty Capital Healthcare Trust III, Inc.; American Realty Capital New York City REIT, Inc.; American Realty Capital New York Recovery REIT, Inc. (now New York REIT); American Realty Capital Trust, Inc.; American Realty Capital Trust III, Inc.; American Realty Capital Trust IV, Inc.; American Realty Capital Trust V, Inc.; ARC Properties Operating Partnership L.P.; ARC Realty Finance Trust Inc. (now Realty Finance Trust, Inc.); and Business Development Corporation of America.

in the Company's financial statements filed with the SEC. While serving as ARCP's auditor, Grant Thornton received millions of dollars in payments from ARCP and other Schorsch-related entities.

## IV.    OFFICER AND DIRECTOR DEFENDANTS' DUTIES

### A.    Fiduciary Duties of Defendants

40.    By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed American Realty and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to American Realty and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

41.    Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

42.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and

4840-9062-2784, v. 1

controls of the Company.  By virtue of such duties, the officers and directors of American Realty were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(c)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

B.     **American Realty's Code of Business and Ethics**

43.     The Board adopted a Code of Business and Ethics (the "Ethics Code") that is applicable to all directors and employees of the Company and its subsidiaries and affiliates.  The Ethics Code states that all directors, officers and employees of the Company are expected to understand and comply with all of the laws, regulations, policies and procedures that apply to them in their position with the Company.  The Ethics Code further states as a public company, it is of "critical importance that the Company's filings with the Securities and Exchange Commission be accurate, timely and in accordance with all applicable laws and regulations."  Additionally, the Ethics Code states that the Company "expects employees, officers and directors to take this responsibility very seriously . . . ."

44.     The Ethics Code also provides that all of the "Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect on the

14

Company's transactions and must conform to applicable legal requirements and to the Company's system of internal controls."

45.     Pursuant to the Ethics Code, employees, officers and directors who suspect or know of violations of the Ethics Code or illegal or unethical business conduct have a duty to report it immediately.  In all cases, employees, directors and officers may directly report such violations outside the Company to appropriate authorities in accordance with the law.  Furthermore, if a director, officer or employee of the Company has unresolved concerns or complaints regarding questionable accounting or auditing matters of the Company, they are encouraged to submit those concerns or complaints to the Company's Audit Committee or CFO.

46.     The Company's Ethics Code requires that each director, officer and employee who is involved in the Company's public disclosure process must: (a) be familiar with and comply with the Company's disclosure controls and procedures and its internal controls over financial reporting; and (b) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

47.     According to the Ethics Code, violation is grounds for disciplinary action up to and including termination of employment, in addition to any civil or criminal liability, which might be imposed by any court or regulatory agency.

48.     Pursuant to the Company's Ethics Code, it is of "critical importance that the Company's filings with the Securities and Exchange Commission be accurate, timely and in accordance with all applicable laws and regulations."   Additionally, the Ethics Code states that the Company "expects employees, officers and directors to take this responsibility very seriously . . . ."  The Company's Ethics Code requires that each director, officer and employee who is

involved in the Company's public disclosure process must: (a) be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and (b) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

49.     It is highly significant that Director Defendants were specifically aware of the critical importance that the Company's filings with the SEC be accurate, timely and in accordance with all applicable laws and regulations, because, among other reasons, it demonstrates that they were aware of the potentially-crippling effects that these potential illegal practices could have upon the Company's business, financial condition and results of operations.

50.     As confirmed by the Ethics Code, violation is grounds for disciplinary action up to and including termination of employment, in addition to any civil or criminal liability which might be imposed by any court or regulatory agency.

### C.     Audit Committee Duties

51.     Pursuant to the Company's Audit Committee Charter, the Audit Committee is responsible for, *inter alia*, overseeing the accounting and financial reporting process of the Company and the audits of the financial statements of the Company.  The Audit Committee is also responsible for monitoring the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements and the Company's overall risk profile.  The Audit Committee is required to report to the Board its findings and actions, including any issues that arise regarding the quality or integrity of the Company's financial statements.  Furthermore, the Audit Committee has the responsibility to review and discuss with management and the Company's Auditor:

4840-9062-2784, v. 1

(a)     major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls;

(b)     any analyses prepared by management or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including the analyses of the effects of alternative GAAP methods on the Company's financial statements;

(c)     the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements;

(d)     the Company's earnings press releases; and

(e)     any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or internal audit function.

52.     The Audit Committee has the sole and exclusive authority to retain and/or replace, as needed, any independent counsel, compensation and benefits consultants and other outside experts or advisors as the Audit Committee believes to be appropriate.  The Audit Committee also has the sole and exclusive power to appoint and terminate the Company's auditor.

53.     As Audit Committee members, these directors are ***held to higher standards of expertise*** and are required to have, *inter alia*: (a) an understanding of financial statements, including a company's balance sheet, income statement and cash flow statement, and (b) sufficient financial experience and ability to enable them to discharge their obligations as Audit Committee members.

### D.     Governance Committee Duties

54.     With respect to the related-party transactions and conflicts of interest, the Governance Committee is responsible for maintaining appropriate controls to assess, authorize and monitor related-party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background of the Company and its Acquisition-Centric Growth Strategy

55.     According to the Company's SEC filings, the Company was incorporated on December 2, 2010 as a Maryland corporation that qualified as a REIT for U.S. federal income tax purposes beginning in the year ended December 31, 2011.

56.     The Company is focused on owning and acquiring single tenant freestanding commercial real estate properties subject to medium-term leases with high credit quality tenants. The Company's primary business objective is to generate dependable monthly cash dividends from a consistent and predictable level of funds from operations ("FFO") and AFFO per share and capital appreciation associated with extending expiring leases or repositioning the Company's properties for lease to new credit worthy tenants upon the expiration of a net lease.

57.     On September 6, 2011, the Company completed its Initial Public Offering ("IPO") and within a few years, the Company was transformed into a real-estate giant holding more than $20 billion in assets through a series of aggressive acquisitions.   The Company's acquisitions (and the accounting fraud that accompanied them as detailed herein) enabled Schorsch and other senior ARCP insiders to reap hundreds of millions of dollars in improper transaction fees, commissions, and compensation.   The payments included, for example, more than $15 million in "post-transaction support services"; more than $2 million in "financing coordination fees"; more than $20 million attributable to the purported sale to the Company of "furniture, fixtures, and equipment" (for which "no evidence" was found substantiating at least a third of such property);

more than $60 million for "strategic advisory services"; more than $175 million in payments for "subordinated distribution fees"; and more than $300 million in "commissions and fees." As the Company later admitted, the accounting scheme increased the bonus pool for these same executives by nearly $100 million in excess of any authorization. In sum, ARCP insiders and their affiliates used the "growth by acquisition" strategy to steal in excess of a billion dollars of capital that but for the fraud they would not have received.

58.     As reported by *The Wall Street Journal* on October 29, 2014, American Realty is the flagship of Schorsch's empire and the Company has spent roughly $15 billion on acquisitions and has completed more than 51 M&A transactions since it went public. The Company's biggest deal came in October 2013 with the acquisition of rival Cole for $7.3 billion and the Company spent approximately $1.5 billion to buy more than 500 Red Lobster locations. By 2014, the Company owned more than 4,400 properties spanning almost 100 million square feet.

59.     Schorsch's appetite for acquisitions and the Company's acquisition-centric growth strategy has drawn criticism from shareholders in the past. The Company's rapid growth has brought concerns over having adequate internal controls to sustain such rapid growth. In June 2014, hedge-fund firm, Marcato Capital Management LP ("Marcato"), at the time one of the Company's largest shareholders, sent a letter to the Company criticizing it for the speed of the Company's acquisitions and the equity offering conducted at the end of May 2014.

60.     Marcato expressed "disappointment over a number of the company's actions," especially for issuing $1.2 billion in new equity at $12 share after the Company repeatedly stated publicly it had no intention to do so. Specifically, Marcato said the Company issued the shares at a "discount to fair value" and the equity offering amounted to "destroying shareholder value." Marcato also highlighted the Company's multiple reporting and disclosure errors that created

"widespread confusion, concern, and doubt about the company's numbers."  It further said the Company's rapid acquisitions of CapLease, Inc. ("CapLease"), ARCT IV, and Cole, followed by the purchase of the Red Lobster portfolio, sale of the multi-tenant retail portfolio, and equity issuance has made its financials complicated and difficult to understand."  Marcato suggested "ARCP should pause on large-scale transaction activity and give investors a chance to see multiple quarters of clean financial results.  Build credibility by letting investors see that the company's pro forma clean financials are consistent with management's guidance, and the market will be obligated to reward the strength of ARCP's asset portfolio and platform with a higher share price."

61.    The Company lies at the center of a complex web of interconnected companies devised by Schorsch.  Schorsch used affiliated entities to raise money for his non-traded REITs, and then used the Company's equity securities as currency to buy out the non-traded REITs.  As reported by *The Wall Street Journal* on November 5, 2014, Schorsch ran more than 20 real estate and alternative-investing companies, many of them interrelated and with overlapping management teams.  Through this elaborate web of corporate arrangements, Schorsch directly and indirectly controlled the accounting for each of his entities, including ARCP.  He also made certain that he profited personally from their operations.  Throughout the wrongdoing alleged herein, he engaged in self-dealing – described to investors as "services" – through which he reaped hundreds-of-millions of dollars in compensation and fees.  Schorsch's related entities include the following:

> ARC Properties Advisors LLC ("ARC Advisors") is a Delaware limited-liability company and was ARCP's external manager during Relevant Period until January 8, 2014.  As external manager of ARCP, ARC Advisors was responsible for ARCP's "affairs on a day-to-day basis."  Pursuant to the terms of a management agreement between ARC Advisors and ARCP, ARC Advisors provided ARCP with its management team, support personnel and resources necessary to implement and execute ARCP's business and growth strategies, including the acquisition of its properties.  ARCP had no employees and ARCP's CEO, President and CIO were all employed by ARC Advisors.  ARC Advisors is directly or indirectly owned and controlled by Schorsch and Block, and Schorsch served

as CEO of ARC Advisors during the Relevant Period.  During the Relevant Period, ARC Advisors was owned, operated and controlled by RCS Capital, LLC, and then AR Capital, LLC.  In ARCP's SEC filings, ARCP stated that ARC Advisors and its parent companies had "the power to direct the activities of [ARCP] through advisory/management agreements."  Even after ARCP purportedly transitioned to self-management on January 8, 2014, ARCP continued to rely on ARC Advisors for at least 60 days, extendable indefinitely at ARCP's discretion, to provide the same services that had previously been provided to ARCP under the old management agreement;

AR Capital LLC ("AR Capital") is a Delaware limited-liability company that purported to provide management and advisory services to ARCP and its affiliates.  During the Relevant Period, all of the equity interests in AR Capital were owned by Schorsch and Block and the following other former officers and/or directors of ARCP: William M. Kahane; Peter M. Budko; and Edward M. Weil, Jr.  AR Capital was directly or indirectly owned and/or controlled by Schorsch and Block.  AR Capital also owned, operated and controlled ARC Advisors, which served as ARCP's external manager prior to January 8, 2014, and for which Schorsch served as CEO.  At times during the Relevant Period, ARCP was dependent upon AR Capital and its subsidiary ARC Advisors to provide "services that are essential to [ARCP]," including asset acquisition and disposition decisions, the sale of shares of the Company's common stock available for issue in follow-on offerings, and accounting services and investor relations.  In connection with the operation of ARCP, ARCP entered into various "administrative support agreements" with AR Capital and paid AR Capital numerous fees, including acquisition fees and financing fees.  During the Relevant Period, Schorsch held executive officer positions at AR Capital and is currently co-founder, Chairman and CEO;

RCAP Holdings, LLC, formerly known as RCS Capital LLC ("RCS Capital"), is a Delaware limited-liability company that operates as an investment and financial services firm.  RCS Capital's subsidiaries have included AR Capital and RCS Capital Corporation.  During the Relevant Period, Schorsch was the Chairman and CEO of RCS Capital.  Through its subsidiaries, RCS Capital offers real estate investment trust management, securities brokerage, investment banking, transaction management, program management, risk analysis and portfolio management.  During the Relevant Period, RCS Capital was owned and controlled by Schorsch; and

RCS Capital Corporation ("RCAP") is a Delaware corporation whose stock is traded on the NYSE using the ticker symbol "RCAP."  RCAP is an investment firm with operating subsidiaries including retail advice services, wholesale distribution, investment banking, capital markets, investment research, investment management and crowdfunding.  During the Relevant Period, RCS Capital was the sole stockholder of RCAP and then its parent

company following the completion of its IPO in June 2013.  During the Relevant Period, RCAP was externally managed by RCS Capital Management, LLC, an entity directly or indirectly controlled by Schorsch, its co-CEO.  During the Relevant Period, Schorsch had "the ability to control the management and major strategic investments of [RCAP]" as a result of his position as a principal and officer of RCS Capital Management, and as executive chairman of RCAP's board of directors, he had the "ability to control the election or replacement of [RCAP's] directors."  During the Relevant Period, Schorsch and Kahane controlled more than 95% of the voting rights with respect to RCAP and thereby effectively controlled all matters affecting RCAP.  RCAP derived substantially all of its revenue from RCAP.  In 2013, RCAP received 80% of its total revenue, approximately $713.5 million, from ARCP.

62.     Furthermore, as reported by *Forbes.com* in an article published on December 19, 2014, the Schorsch empire is "[a] fully integrated operation [that] not only manufactured nontraded, high-yielding REITs, it also provided research and advisory services to them, and controlled the second-largest independent financial advisory operation in the nation (and 9,200 brokers) who peddled them."  The article further stated in relevant part:

> This strategy–plus rising property values during the economic recovery–allowed him to deliver eye-popping 49%, 40%, and 33% returns for investors in three of his early funds.  An excellent salesman, between 2008 and the middle part of 2014, Schorsch managed to raise some $17 billion for his 17 nontraded REITs, business development company and an energy fund.

> But analysts have long complained that the company management– and in particular Schorsch–have had difficulty providing transparency, and that Schorsch became inappropriately adversarial when questions were raised about the company's numbers.  Analysts noticed sloppy accounting errors well before the October admission.

63.     In 2013 and 2014, for example, ARCP incurred fees and expenses payable to ARC Advisors "and its affiliates" for services related to its mergers with ARCT III and ARCT IV.  ARCP incurred $94 million in costs related to the ARCT IV merger payable to ARC-related entities for items such as "strategic advisory services" and "subordinated distribution fees."  In 2013, in connection with the ARCT III merger, ARCP incurred fees and expenses of over $106

22

million payable to ARC-related entities.  ARCP paid a subsidiary of AR Capital over $98 million in 2013 as an "incentive fee" in connection with the ARCT III merger.

64.     Two of ARCP's final cash transfers to ARC Advisors and its "affiliates" underscore Defendants' fraudulent scheme to deceive shareholders in order to tax the Company with hundreds of millions of dollars in improper fees and services, thus lining the pockets of Schorsch, Block and other senior executives.  In 2014, the Company paid $20 million to ARC Advisors and its affiliates solely to switch from external management to internal management.  This $20 million was evenly split between "post transaction support services" and "furniture, fixtures, and equipment," which the Company acknowledged could not be substantiated or supported by documentary evidence. ARCP's transition to self-management was "a condition to closing the merger" with Cole.

65.     Similarly, in connection with the Cole merger, Schorsch's entities obtained a $32 million payout, including $28 million to Realty Capital Securities LLC, an entity owned by AR Capital, for "financial advisory and strategic services"; $2.9 million to RCS Advisory Services, LLC, a subsidiary of RCAP, for "transaction management services"; and $750,000 to ANST for "[r]etention as non-exclusive advisor and information agent." ARCP paid a subsidiary of RCS Capital Corporation ("RCAP"), Realty Capital Securities, LLC, $46.9 million between January 2013 and May 2014 for "investment banking and strategic advisory services" related to the Cole merger.

66.     RCS Capital LLC ("RCS Capital"), another Schorsch-controlled entity, entered into a letter agreement with ARCP pursuant to which RCS Capital agreed to act as financial advisor to ARCP in connection with the Cole merger.  RCS Capital attended numerous meetings of the ARCP Board in connection with the Cole merger and participated in discussions regarding the offering and purchases of Cole shares.

4840-9062-2784, v. 1

67.     The various ways money was funneled from the Company was so complex that a months-long Audit Committee investigation resulted in no more than vague findings of "certain payments" to Schorsch-related entities "that were not sufficiently documented or [that] otherwise warrant scrutiny," and a lingering question as to "whether [ARCP] has a right to seek recovery for any other such payments and, if so, its alternatives for recovery."

### B.     The Company's AFFO Metric

68.     As a public company, American Realty is required to report its financial results in accordance with GAAP.   As noted above, the single most critical metric relied upon by analysts and investors in valuing a REIT is a measure of operating performance called AFFO.

69.     AFFO is based on another commonly accepted measure of operating performance for REITs called Funds from Operations, or FFO.  To sustain the Company's fast paced acquisition strategy and raise needed capital, the Company had to meet aggressive AFFO standards.

70.     AFFO -- a non-GAAP measure which REIT industry groups support for use in communications to stakeholders and financial disclosures – is essentially the REIT industry's equivalent for earnings.

71.     During the wrongdoing alleged herein, the Company touted AFFO as not only as a reference point investors should use to access the sustainability of the Company's long-term performance and in comparing the Company's operating performance to other companies, but also as a metric for valuing the Company.

72.     Furthermore, numerous references were made to AFFO in the Company's press releases accompanying the disclosure of its financial results, always including "increased AFFO" as one of the "highlights" of such results.  As the Company has acknowledged in its SEC filings, AFFO:

[P]rovides information consistent with management's analysis of the operating performance of the properties.  By providing AFFO, *ARCP believes it is presenting useful information that assists investors and analysts to better assess the sustainability of our operating performance*.  Further, ARCP believes AFFO is *useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies, including exchange-traded and non-traded REITs*. [Emphasis added].

**C.    The Criminal Indictment of Block Details the Illegal Accounting Scheme and Resulting Cover-Up**

73.    According to the indictment entitled *United States of America v. Brian Block*, 1:16-CRIM-595 (S.D.N.Y) (hereinafter, the "Indictment"), from at least on or about July 2014 through on or about August 2014, Block, McAlister, and others known and unknown, participated in an accounting fraud scheme in which they caused ARCP to report, in public filings with the SEC and to the investing public, falsely inflated AFFO and AFFO per share, key metrics used to evaluate ARCP's financial performance, for the second quarter of 2014 ("Q2 2014") and the first six months of 2014 ("year to date 2014" or "YTD 2014").   Block and others within the Company caused ARCP to falsely inflate these figures in order to ensure that they were consistent with ARCP's publicly announced guidance for AFFO and to conceal accounting errors made in calculating these metrics for the first quarter of 2014.

74.    According to the Indictment, in the months and weeks leading up to the July 29, 2014 filing of the Form 10-Q with the SEC setting forth ARCP's financial statements for the Q2 2014, Block, along with McAlister and others, came to understand that the method used by ARCP to calculate AFFO in the first quarter of 2014 ("Q1 2014") and in certain previous quarters was erroneous in that it incorrectly used a combination of the gross method and the net method when calculating its AFFO and AFFO per share for these quarters.  A co-conspirator not named as a defendant in the indictment ("CC-l") who held the position of Director of Financial Reporting at

ARCP, brought this methodological error to the attention of Block, McAlister and others shortly before the filing of ARCP's first quarter Q1 2014 Form 10-Q, but no corrective change was made to the Q1 2014 Form 10-Q while the issue was under review.  Following the filing of the Q1 2014 Form 10-Q, CC-l concluded, and advised Block, McAlister and others, that the reported AFFO per share calculation for the Q1 2014 was overstated by approximately $0.03 per share.  Instead of $0.26 per share, which was publicly reported by ARCP to its shareholders and the investing public, and which placed ARCP on track to meet its full-year AFFO per share guidance, the correct calculation of AFFO per share should have been $0.23 per share.

75.     According to the Indictment, on or about July 24, 2014, a draft of ARCP's Q2 2014 Form 10-Q was circulated to members of the Audit Committee in advance of a conference call scheduled for the next day.  Among others, Block, McAlister and CC-1 were copied on the email. This draft Q2 2014 Form 10-Q included, on a net basis, an AFFO calculation for Q2 2014 of $198.596 million.   It also included AFFO for the six-month period ending June 30, 2014 ("YTD 2014") of $346.376 million.  Incorporated into this six-month figure was the AFFO figure from Q1 2014 that Block, McAlister and CC-1 knew to be falsely inflated.

76.     According to the Indictment, on or about July 28, 2014, the day before ARCP was to file its Q2 2014 Form 10-Q, CC-1 caused to be sent to McAlister and several employees of the Grant Thornton, a "blackline" of ARCP's draft Q2 2014 Form 10-Q, which showed changes from a previously circulated version, as well as the current draft of the Q2 2014 Form 10-Q.  McAlister then forwarded the draft Q2 2014 Form 10-Q to Block and others.   Like the draft Q2 2014 Form 10-Q sent to the Audit Committee on July 24, 2014, the draft sent to Grant Thornton included an AFFO calculation for YTD 2014 that was improperly inflated, as Block well knew, because it was based in part on the erroneous, inflated AFFO figure for Q1 2014.

4840-9062-2784, v. 1

77.     According to the Indictment, on or about July 28, 2014, Block, and others decided to switch the AFFO calculation presented in the Q2 2014 Form 10-Q from the net method that had been utilized (incorrectly) in the Form 10-Q for the previous quarter to the gross method.  That evening, Block met with McAlister and CC-1 in his office at ARCP in Manhattan, New York, for the purpose of finalizing the numbers that were to be included in the Q2 2014 Form 10-Q.  Utilizing a correct calculation under the gross method would have exposed that the reported AFFO and AFFO per share figures from Q1 2014 were inflated.   Accordingly, during that meeting, Block, McAlister, and CC-1 inserted into a spreadsheet Block was using to calculate AFFO and AFFO per share for the first and second quarters of 2014 and for YTD 2014, without any justification, figures that fraudulently inflated the AFFO and AFFO per share calculations that were to be included in the Q2 2014 Form 10-Q and the related press release, both of which were to be publicly filed with the SEC the following day.  The fraudulent numbers Block, McAlister, and CC-l used to inflate the AFFO and AFFO per share figures had no basis in fact, were without documentary support, and did not tie to ARCP's general ledger accounting system, as Block knew and understood at the time.

78.     According to the Indictment, after inserting these fraudulent numbers, Block emailed McAlister and CC-l a spreadsheet entitled "Q2 2014 AFFO recast" (the "Recast Spreadsheet").  The Recast Spreadsheet set forth the fraudulently inflated AFFO and AFFO per share calculations for both the first and second quarters of 2014 and for YTD 2014 that Block, McAlister, and CC-1 had just inserted.  CC-1 then used the Recast Spreadsheet to input materially false figures into the AFFO table in the Q2 2014 Form 10-Q that was to be filed with the SEC the following day.

79.     According to the Indictment, on or about July 29, 2014, CC-1 caused the revised Q2 2014 Form 10-Q, including the falsely inflated AFFO calculations for the Q2 2014 and YTD 2014, to be sent to the Auditor.

80.     According to the Indictment, on or about July 29, 2014, ARCP filed the Q2 2014 Form 10-Q with the SEC.  The Q2 2014 Form 10-Q included the fraudulently inflated AFFO figures prepared the previous evening by Block, McAlister, and CC-l.  Specifically, the Q2 2014 Form 10-Q included, on a gross basis, a fraudulently inflated AFFO for the Q2 2014 of $205.278 million and a fraudulently inflated AFFO for the first six months of 2014 of $353.058 million, which included the fraudulently inflated AFFO figure for the first quarter of 2014 that was included in the Recast Spreadsheet.

81.     According to the Indictment, on the same date that the Q2 2014 Form 10-Q was filed, ARCP filed a Form 8-K with the SEC, which attached an ARCP-issued press release (the "Second Quarter Press Release") as an exhibit.  The Second Quarter Press Release was headlined: "American Realty Capital Properties Announces Second Quarter 2014 Operating Results."  The Second Quarter Press Release touted: "Generated Revenues of $382.0 Million and AFFO per share of $0.24 up 595.2% and 26% Respectively from Prior Year Period."  Among the "operating highlights" for the quarter was an item that similarly stated: "Increased AFFO to $205.3 million, up 429.0% compared to the same period a year earlier, and increased AFFO per share to $0.24, up 26% compared to the same period a year earlier."

82.     According to the Indictment, with regard to YTD 2014 specifically, the fraud resulted in an intended overstatement of AFFO by approximately $13 million and an overstatement of AFFO per share by approximately $0.03, or approximately 5% of total AFFO per share.  By reporting AFFO per share of $0.24 in the second quarter, after having reported AFFO per share of

28

$0.26 in the first quarter, Block, McAlister, and CC-1 misled ARCP's shareholders and the investing public by falsely representing that ARCP's AFFO per share for the first six months of 2014 was consistent with analysts' expectations and on track to meet the full-year guidance for AFFO per share of $1.13 to $1.19 that the company had announced on October 23, 2013 and subsequently reiterated.

### D. Defendants Allowed the Company to File Numerous False and Misleading Filings with the SEC Regarding its Financial Results and Internal Controls

83.    During the wrongdoing alleged herein, Defendants allowed the Company to violate GAAP and SEC regulations governing the reporting of the Company's financial results and the maintenance of an effective system of internal control over financial reporting and public disclosure. Furthermore, Defendants caused the Company to materially misstate its FFO and AFFO *for each and every year that ARCP has been a public company*, that is, fiscal years 2011, 2012 and 2013, and interim quarters ended March 31, 2013, June 30, 2013, September 30, 2013, March 31, 2014 and June 30, 2014.

84.    Defendants caused the Company to violate GAAP standards and SEC rules because, as the Company has admitted, the financial information contained in its financial statements was not prepared in conformity with applicable GAAP and SEC requirements, nor was the financial information a fair presentation of the Company's operations.  The Company has also admitted that management was aware of certain errors that "were intentionally not corrected," and that other "errors were intentionally made."   The false and misleading press releases and SEC filings during the wrongdoing alleged herein included, but were not limited to, the following:

### B.    Third Quarter 2011 Financial Results

85.    On November 14, 2011, Defendants caused the Company to issue a press release announcing its financial results for the third quarter, ended September 30, 2011 ("3Q11").

Defendants caused the Company to report 3Q11 AFFO of $287,000, or $0.17 per share, and a net loss of ($634,000) or ($0.42) per share.

86.     On November 14, 2011, Defendants caused the Company to file with the SEC its Form 10-Q for the period ended September 30, 2011 (the "3Q11 Form 10-Q").  The 3Q11 Form 10-Q was signed by Schorsch and Block and reiterated the Company's previously reported financial results.  It also represented that these financial results were accurate and presented in accordance with GAAP.  In addition, the 3Q11 Form 10-Q (and each of the Company's quarterly and annual reports filed with the SEC described herein) contained certifications signed by Schorsch and Block.

### E.     Fourth Quarter 2011 Financial Results

87.     On March 19, 2012, Defendants caused the Company to issue a press release announcing its financial results for the fourth quarter, ended December 31, 2011 ("4Q11"). Defendants caused the Company to report AFFO of $1,491,000, or $0.23 per share, and a net loss of ($1,117,000), or ($0.17) per share.  The release also noted that the Company's "2012 AFFO should range from $0.94 to $0.96 per share."

88.     That same day, Defendants caused the Company to file with the SEC its Form 10-K for the fiscal year ended December 31, 2011 (the "2011 Form 10-K").  The 2011 Form 10-K was signed by Schorsch, Block, Weil and Rendell.  It reiterated the Company's previously reported financial results.  It also represented that these financial results were accurate and presented in accordance with GAAP.  The 2011 Form 10-K further stated that the Company's internal controls were effective and that any material changes to the Company's internal controls over financial reporting were disclosed therein.  The Form 10-K included certifications by Schorsch and Block.

### F.     First Quarter 2012 Financial Results

30

89.     On May 8, 2012, Defendants caused the Company to issue a press release announcing its financial results for the first quarter, ended March 31, 2012 ("1Q12").  Defendants caused the Company to report a 1Q12 AFFO of $1,583,000, or $0.22 per share, and a net loss of ($630,000), or ($0.09) per share.  Schorsch was quoted in the press release in relevant part as follows:

> We continue to execute on our strategy of assembling a well-diversified portfolio of investment properties containing vintage net leases at attractive prices. . . .  We are focused on increasing core earnings within our expanding portfolio. . . .  We believe the corresponding results to ARCP's earnings are accretive to our existing common stockholders.

90.     The press release also announced that the Company was increasing its 2012 estimated AFFO, stating that in "March 2012, the Company estimated that 2012 AFFO should range from $0.94 to $0.96 per share . . . .  [T]he Company is revising its 2012 estimated AFFO per share range to $1.04 to $1.07."

91.     On May 9, 2012, Defendants caused the Company to file its Form 10-Q for the period ended March 30, 2012 with the SEC (the "1Q12 Form 10-Q").  The 1Q12 Form 10-Q was signed by Schorsch and Block and reiterated the Company's previously reported financial results. It also represented that the financial results contained therein were accurate and presented in accordance with GAAP, that the Company's internal controls were effective and that any material changes to the Company's internal controls over financial reporting were disclosed.  The 1Q12 Form 10-Q also included Schorsch's and Block's certifications.

92.     On or about June 18, 2012, the Company raised $30.5 million via the sale of 3.25 million newly issued shares of Company common stock at $10 per share (the "June 2012 Equity Offering"), pursuant to a false registration statement filed May 25, 2012, along with a prospectus filed June 14, 2012, which was incorporated therein (collectively, the "June 2012 Equity Offering

Documents"). The June 2012 Equity Offering Documents included the Company's 1Q12 financial results, as well as its 1Q12 AFFO.

### G.   Second Quarter 2012 Financial Results

93.     On July 31, 2012, Defendants caused the Company to issue a press release announcing its financial results for the second quarter, ended June 30, 2012 ("2Q12"), including a net loss of ($2.04 million), or ($0.28) per share, and AFFO of $1.9 million, or $0.25 per share. The release emphasized that the Company's "core earnings have increased significantly[.]" Schorsch commented on the Company's financial results, stating:

> that "[s]ince our initial public offering, we have continually and consistently demonstrated our ability to grow earnings through accretive acquisitions . . . the proceeds from two recently completed follow-on offerings of common stock, the issuance of convertible preferred stock and operating partnership units, and prudent use of our cost effective credit facility.
>
> We are especially pleased to be able to raise our earnings guidance for calendar year 2012 by 8.5%, clarifying fiscal year 2012 guidance for AFFO of $1.13 to $1.16 per share, or $0.09 per share based on the mid-points of the respective ranges. Furthermore, we are initiating preliminary guidance for 2013, at AFFO levels of $1.25 to $1.28 per share . . . thereby targeting AFFO growth of over 10% for 2013. [Emphasis added].

94.     Also, on August 1, 2012, Defendants caused the Company to file its Form 10-Q for the period ended June 30, 2012 with the SEC (the "2Q12 Form 10-Q"), which was signed by Schorsch and Block. The 2Q12 Form 10-Q reiterated the Company's previously reported financial results and represented that those financial results were accurate and presented in accordance with GAAP. It also represented that the Company's internal controls were effective and that any material changes to the Company's internal controls over financial reporting were disclosed therein. The 2Q12 Form 10-Q also included Schorsch's and Block's certifications.

### H.   Third Quarter 2012 Financial Results

95.    On October 29, 2012, Defendants caused the Company to issue a release announcing its financial results for the third quarter, ended September 30, 2012 ("3Q12"). Defendants caused the Company to report 3Q12 AFFO of $3.1 million, or $0.28 per share, and a net loss of ($804,000), or ($0.09) per share.  Commenting on the Company's "core earnings," Block was quoted as follows:

> *During the quarter ended September 30, 2012, the Company generated AFFO of $3.1 million, or $0.28 per share computed using basic weighted average shares outstanding. This represents a 15.0% increase in AFFO per share compared to the second quarter ended June 30, 2012*.  Further, our recently announced 'at the market' or ATM program will provide equity capital allowing us to purchase properties accretive to our dividend, fueling our growth strategy.  [Emphasis added].

96.    Also, on October 29, 2012, Defendants caused the Company to file its Form 10-Q for the period ended September 30, 2012 with the SEC (the "3Q12 Form 10-Q"), which was signed by Schorsch and Block, and reiterated ARCP's previously reported financial results that represented that: (a) those financial results were accurate and presented in accordance with U.S. GAAP; (b) the Company's internal controls were effective; and (c) any material changes to the Company's internal controls over financial reporting were disclosed.  The 3Q12 Form 10-Q also included Schorsch's and Block's certifications.

## I.    Fourth Quarter 2012 Financial Results

97.    On February 28, 2013, Defendants caused the Company to issue a press release announcing its financial results for the fourth quarter of 2012 ("4Q12") and FY12, including 4Q12 AFFO of $3.4 million, or $0.28 per share, and FY12 AFFO of $10.5 million, or $1.08 per share, a net loss of ($7.3 million), or ($0.84) per share.  Schorsch extolled the success and growth the Company reported during FY12, stating that:

> "Our first full calendar year of operations has seen us exceed our financial projections across the board . . ." and that the ARCT III

33

merger "will result in geometric growth to our property portfolio that provides our shareholders with durable dividend income augmented by extraordinary earnings growth potential."

98.     Defendants caused the Company to reaffirm its FY13 AFFO guidance of $0.91 - $0.95 per share and fiscal year 2014 ("FY14"), $1.06 - $1.10 per share.  Block commented on the Company's financial results, stating in pertinent part:

> "*At $1.15 per share (basic), based on adjusted funds from operations, we're pleased to report that our 2012 earnings are at the high-end of our guidance published in July 2012,*" noted Brian S. Block, executive vice president and chief financial officer. "Moreover, *the Company is positioned for dynamic growth in the future. In fact, our earnings guidance for 2014 suggests a growth rate of 16% from 2013, an extraordinary trajectory for a net lease company*.  The Company's enterprise value is over $3 billion in an industry where size matters."  [Emphasis added].

99.     That same day, Defendants caused the Company to file its Form 10-K for the period ended December 31, 2012 with the SEC (the "2012 Form 10-K").  The 2012 Form 10-K was signed by Schorsch, Weil, Block, and Michelson.  The 2012 Form 10-K reiterated the Company's previously reported financial results and stated that the financial results were accurate and presented in accordance with GAAP.  The 2012 Form 10-K also represented that the Company's internal controls were effective, and that any material changes to the Company's internal controls over financial reporting were disclosed.  The 2012 Form 10-K included Schorsch's and Block's certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX"), attesting that the financial information contained in the filing was true, that the 2012 Form 10-K did not omit material facts and that the Company's internal and disclosure controls were effective.

**J.     First Quarter 2013 Financial Results**

100.     On May 6, 2013, Defendants caused the Company to issue a press release announcing its financial results for 1Q13.  The Company reported 1Q13 AFFO of $30.8 million, or $0.20 per fully diluted share, compared to AFFO of $3.4 million during the fourth quarter of

34

2012.  Defendants also caused the Company to report a net loss of ($137.9 million), or ($0.90) per share.  Schorsch commented on the Company's financial results, stating in pertinent part:

> We are very pleased with our first quarter results which are in line with our earlier 2013 earnings guidance, ***projecting earnings growth of 16%*** between 2013 and 2014, and we are ***particularly well positioned for continued earnings growth***. . . .  We intend to continue executing our highly accretive organic acquisition program on which our earnings guidance is constructed . . . .  [Emphasis added].

101.    Also on May 6, 2013, Defendants caused the Company to file its Form 10-Q for the period ended March 31, 2013 with the SEC (the "1Q13 Form 10-Q"), which was signed by Schorsch and Block.  The 1Q13 Form 10-Q reiterated the Company's previously reported financial results, and represented that those financial results were accurate and presented in accordance with GAAP.  The 1Q13 Form 10-Q also represented that the Company's internal controls were effective and that any material changes to the Company's internal controls over financial reporting were disclosed.  It also included Schorsch's and Block's certifications.

### K.    Second Quarter 2013 Financial Results

102.    On August 6, 2013, Defendants caused the Company to issue a press release announcing "[r]ecord" results for 2Q13.   For the quarter, Defendants caused the Company to report AFFO of $32.8 million, or $0.19 per share, and a net loss of ($51.7 million), or ($0.32) per share.   In addition, the Company raised its previously-issued full-year 2014 AFFO per share guidance by almost 8%, from a range of $1.06 to $1.10 per share, to $1.14 to $1.18 per share.

103.    Also on August 6, 2013, Defendants caused the Company to file its Form 10-Q for the period ended June 30, 2013 with the SEC (the "2Q13 Form 10-Q"), which was signed by Schorsch and Block.  The 2Q13 Form 10-Q reiterated the Company's previously announced financial results.  It also represented that the financial results therein were accurate and presented in accordance with GAAP, that the Company's internal controls were effective and that any

material changes to the Company's internal control over financial reporting were disclosed therein.

The 2Q13 Form 10-Q also included Schorsch's and Block's certifications pursuant to SOX.

**L.**     **Third Quarter 2013 Financial Results**

104.    On November 7, 2013, Defendants caused the Company to issue a press release

announcing its financial results for 3Q13.  For the quarter, Defendants caused the Company to

report AFFO of $46.7 million, or $0.21 per share, representing a quarter-to-quarter increase of

over 42%, and confirmed "[u]pdated AFFO pro forma 2014 guidance of $1.13 to $1.19 per share."

Schorsch and Block commented on the Company's financial results, stating in pertinent part:

> Defendant Schorsch:
>
> ***We have continued to build enterprise value during this third quarter, and for now are intently focused on execution*** . . . .  In this regard, we have identified several near-term key objectives: completing the announced ARCT IV and Cole transactions; becoming self-managed and significantly broadening our intellectual capital by continuing to attract the best and brightest managers in the industry; deleveraging and terming out our balance sheet utilizing long-term, fixed rate debt; and effectively and seamlessly integrating Cole organization.  [Emphasis added].
>
> *       *       *
>
> We are fully committed to becoming self-managed, as promised . . . .  In fact, it is a closing condition for our merger with Cole.  We will announce the President of ARCP before year-end. We have already moved to bolster our team with several key hires. Brian Block, our CFO, will now be focused exclusively on ARCP. Lisa Beeson joins us as COO after 25 years as an investment banker with tremendous M&A and capital markets expertise. Lisa Pavelka McAlister is our new CAO with 25 years' experience in senior financial roles versed in all aspects of financial and accounting operations.
>
> *       *       *
>
> Defendant Block:

36

4840-9062-2784, v. 1

> ***Our 3rd quarter operating results are in-line with projections*** . . . .
> We are well positioned to close our pending acquisitions and
> execute our capital plan.  [Emphasis added].

105. Also on November 7, 2013, Defendants caused the Company to file with the SEC
its Form 10-Q for the period ended September 30, 2013 (the "3Q13 Form 10-Q").  The 3Q13 Form
10-Q, which was signed by Schorsch and Block, reiterated the Company's previously announced
financial results and represented that those financial results were accurate and presented in
accordance with GAAP.  It also represented that the Company's internal controls were effective
and disclosed any material changes to the Company's internal controls over financial reporting,
and included Schorsch's and Block's certifications.

### M.   Fourth Quarter 2013 Financial Results

106. On February 27, 2014, Defendants caused the Company to issue a press release and
file a Form 8-K with the SEC, announcing its financial and operating results for the fourth quarter
and full year ended December 31, 2013.  According to the press release, the Company had
exceeded 2Q13 AFFO estimates given in 2Q13 and generated "record operating results for the full
year ended December 31, 2013[.]" For 4Q13, the Company reported AFFO of $55.8 million, a
year-over-year increase of 153%, or $0.25 per share, a year-over-year increase of 108% and a net
loss of ($157.8 million), or ($0.85) per share.  For FY13, the Company reported AFFO of $163.9
million, an increase of 240% from 2012, or $0.86 per share, an increase of over 80% from 2012
and a net loss of ($406.5 million), or ($2.36) per share.  The Company also reiterated its full year
2014 AFFO per share guidance of $1.13-$1.19 per share.

107. In the press release, the terms "Funds From Operations and Adjusted Funds From
Operations" were defined and represented the significance of AFFO in assessing the Company's
financial performance:

Funds From Operations and Adjusted Funds From Operations

37

Due to certain unique operating characteristics of real estate companies, as discussed below, the National Association of Real Estate Investment Trusts, Inc. ("NAREIT"), an industry trade group, has promulgated a measure known as funds from operations ("FFO'), which we believe to be an appropriate supplemental measure to reflect the operating performance of a REIT.  The use of FFO is recommended by the REIT industry as a supplemental performance measure.  FFO is not equivalent to our net income or loss as determined under U.S. GAAP.

We define FFO, a non-GAAP measure, consistent with the standards established by the White Paper on FFO approved by the Board of Governors of NAREIT, as revised in February 2004 (the "White Paper").  The White Paper defines FFO as net income or loss computed in accordance with U.S. GAAP, excluding gains or losses from sales of property but including asset impairment write downs, plus depreciation and amortization, after adjustments for unconsolidated partnerships and joint ventures.  Adjustments for unconsolidated partnerships and joint ventures are calculated to reflect FPO.  Our FFO calculation complies with NAREIT's policy described above.

*     *     *

By providing AFFO, we believe we are presenting useful information that assists investors and analysts to better assess the sustainability of our ongoing operating performance without the impacts of transactions that are not related to the ongoing profitability of our portfolio of properties.  We also believe that AFFO is a recognized measure of sustainable operating performance by the REIT industry. Further, we believe AFFO is useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies that are not as involved activities which are excluded from our calculation.

*     *     *

*As a result, we believe that the use of FPO and AFFO, together with the required U.S. GAAP presentations, provide a more complete understanding of our performance relative to our peers and a more informed and appropriate basis on which to make decisions involving operating, financing, and investing activities.* [Emphasis added].

38

108.    Also, on February 27, 2014, Defendants caused the Company to file a Form 10-K with the SEC, which was signed by Defendants Schorsch, Beeson, Block, Kay, McAlister, Michelson, Stanley, Bowman, Rendell, and Sealy.   The Form 10-K reiterated the Company's previously announced quarterly and fiscal year-end financial results and financial position and deemed the Company's disclosure controls and procedures as "effective."   In addition, the Form 10-K contained signed certifications by Schorsch and Block pursuant to SOX.

### N.      First Quarter 2014 Financial Results

109.    On May 8, 2014, Defendants caused the Company to issue a press release and file a Form 8-K with the SEC, announcing the Company's financial and operating results for the first quarter ending March 31, 2014.   The press release touted that that the Company had achieved "***Record First Quarter 2014 Operating Results***."   The Company reported AFFO available to common stockholders of $147.4 million, or $0.26 per share, representing a year-over-year increase of 334.6%.   The Company reaffirmed its full-year 2014 AFFO guidance of $1.13-$1.19 per share.

110.    That same day, Defendants caused the Company to file a Form 10-Q with the SEC, which was signed by Schorsch and Block, and reiterated the Company's previously announced quarterly financial results and represented that the Company's financial results were accurate and presented in accordance with GAAP and that the Company's internal controls were effective.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Schorsch and Block, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

### O.      Second Quarter 2014 Financial Results

111.    On July 29, 2014, Defendants caused the Company to issue a press release and file a Form 8-K with the SEC, announcing the Company's financial and operating results for the second quarter ending June 30, 2014.   Total revenues were $382.0 million for the three months

ended June 30, 2014, compared to $54.9 million for the prior year period, representing an increase of 595.2%.  NOI was $305.2 million for the three months ended June 30, 2014, compared to NOI of $51.9 million for the prior year period, representing a 488.1% increase.  FFO for the three months ended June 30, 2014 totaled $174.7 million, or $0.20 per share fully diluted. FFO for the six months ended June 30, 2014 totaled ($15.1) million.  AFFO for the three months ended June 30, 2014 totaled $205.3 million or $0.24 per fully diluted share.  AFFO for the six months ended June 30, 2014 totaled $353.1 million, or $0.49 per fully diluted share.  Additionally, the press release included a substantially similar explanation of FFO and AFFO as those set forth in the Company's previous SEC filings.

112.    That same day, Defendants caused the Company to file a Form 10-Q with the SEC which was signed by Schorsch, Block, and McAlister, and reiterated the Company's previously announced quarterly financial results and financial position.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Schorsch and Block, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

113.    The SEC filings referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them, including that: (a) American Realty's financial statements contained intentional errors related to, among other things, the improper classification of its AFFO, resulting in an overstatement of AFFO; (b) American Realty lacked adequate internal control over financial reporting; and (c) as a result of the foregoing, American Realty's public statements were materially false and misleading at all relevant times.

P.    **The Illegal Accounting Scandal Comes to Light and the Company Files a <u>Massive Restatement</u>**

114.    On October 29, 2014, Defendants caused the Company to issue a press release and

file a Form 8-K with the SEC, announcing that certain of its previously issued financial statements

contained errors and should no longer be relied upon.  In addition, Defendants caused the Company

to announce that effective immediately, Block and McAlister resigned from their positions.  The

press release stated in relevant part:

> NEW YORK, NY October 29, 2014 - American Realty Capital
> Properties, Inc. ("ARCP") (NASDAQ: ARCP) announced today the
> conclusion of its Audit Committee that *the previously issued
> financial statements and other financial information contained in
> the Company's Annual Report on Form 10-K for the fiscal year
> ended December 31, 2013 and Quarterly Reports on Form 10- Q
> for the fiscal periods ended March 31, 2014 and June 30, 2014,
> and the Company's earnings releases and other financial
> communications for these periods, should no longer be relied
> upon.*    The Audit Committee based its conclusions on the
> preliminary findings of its investigation into concerns that were first
> reported to it on September 7, 2014.  The Audit Committee promptly
> initiated an investigation, which is being conducted with the
> assistance of independent counsel and forensic experts. Senior
> management was informed of the preliminary findings of the
> investigation on October 24, 2014.
>
> *      *      *
>
> [B]ased on the preliminary findings of the investigation, the Audit
> Committee believes that the Company incorrectly included certain
> amounts related to its non-controlling interests in the calculation of
> adjusted funds from operations ("AFFO"), a non-U.S. GAAP
> financial measure, for the three months ended March 31, 2014 and,
> as a result, overstated AFFO for this period.  The Audit Committee
> believes that this error was identified but intentionally not corrected,
> and other AFFO and financial statement errors were intentionally
> made, resulting in an overstatement of AFFO and an understatement
> of the Company's net loss for the three and six months ended June
> 30, 2014.
>
> *      *      *
>
> The investigation is ongoing and there can be no assurance that the
> potential adjustments set forth in the attached financial table will not
> change based upon the final results of the investigation, and any
> such change could be material.

The Audit Committee has indicated that nothing has come to its attention that leads it to believe that there are any errors in the Company's previously issued audited consolidated financial statements for the fiscal year ended December 31, 2013 contained in the Company's 2013 Form 10-K. However, the Audit Committee has expanded its investigation to encompass the Company's audited financial statements for this period in light of the fact that the Company's former Chief Financial Officer and former Chief Accounting Officer had key roles in the preparation of those financial statements.

\*      \*      \*

The Company also announced that effective immediately, Michael Sodo has been named Chief Financial Officer of the Company, replacing Brian Block . . . .  Gavin Brandon will serve as Chief Accounting Officer, replacing Lisa McAlister and reporting to Mr. Sodo . . . . **Mr. Block and Ms. McAlister have resigned effective immediately.**

**In light of the preliminary findings of the Audit Committee's investigation, the Company is re-evaluating its financial reporting controls and procedures.** The Company intends to make the necessary changes to its controls and procedures to remediate any control deficiencies that are identified through the Audit Committee's investigation.

The Company will work with the Audit Committee and the Audit Committee's independent advisors to determine the adjustments required to be made to the Company's previously issued financial statements, including the calculation of AFFO, as expeditiously as possible.  Upon completion of this process, which could identify further required adjustments in addition to those discussed above, the Company will restate prior financial statements and amend its prior periodic filings to the extent required and update its earnings guidance at that time.

The Company will file its Quarterly Report on Form 10-Q for the period ended September 30, 2014 after the amended filings have been made.  [Emphasis added].

115.    Defendants caused the Company to hold a conference call where the Company's

then CEO Kay disclosed that in the second quarter of 2014, certain actions were taken "in order to

conceal the error from the first quarter."   In addition, Kay disclosed that certain expenses "should

have been accrued in the second that ended up resulting in accrual in the third quarter instead. Those numbers were roughly $10.5 million."

116.    On March 2, 2015, the Company filed its restated financial statements which confirmed that numerous GAAP violations occurred for the following seven consecutive reporting periods: (a) the year ended December 31, 2012; and (b) the year ended December 31, 2013, as well as the quarters ended March 31, 2013; June 30, 2013; September 30, 2013; March 31, 2014; and June 30, 2014, including filing a Form 10-K/A, amending years ended December 31, 2013 and 2012, and Forms 10-Q/A amending quarters ended March 31, 2014 and 2013, June 30, 2014 and 2013, and September 30, 2013.

117.    Specifically, the financial statements and other filings with the SEC were materially false and misleading as a result of the following:

### (1)    Expenses Were Understated and Deferred to Later Periods

118.    Defendants allowed the Company to artificially understate the Company's net losses by improperly, systematically and continually understating expenses.  The Company achieved this improper timing of expense recognition by: (a) improperly deferring current period expenses to later periods using a variety of methods to defer merger-related expense, tax liability, bonus accruals, stock award expenses, depreciation and interest expenses; (b) improperly capitalizing expenses as assets and amortizing them over time, rather than correctly expensing them at the time they were incurred; and (c) failing to write down the value of impaired assets.

119.    The Company admittedly failed to record $14.5 million of merger and other non-routine transaction-related expenses that were "incorrectly excluded" from the 2013 financial statements.  Instead, the Company delayed recording this expense, and the associated increase in

43

net loss, until 1Q14.  Defendants caused the Company to fail to record $1.2 million of merger and other non-routine transaction-related expenses that were incorrectly excluded from the 2Q14 financial statements.

### (2)    *Deferred Merger-Related Transfer Tax Liability*

120.    Defendants allowed the Company to record transfer tax liabilities in incorrect accounting periods.  Defendants caused the Company to improperly understate the Company's loss by excluding certain merger and non-routine transaction-related expenses during 2013.  These accruals and corresponding merger and other non-routine transaction-related expenses were improperly excluded from the 2013 financial statements.  The Company should have recorded a controlling interest transfer tax liability upon consummation of the ARCT III merger and the Company's merger with CapLease totaling $1.1 million and $8.9 million for first quarter of 2013 ("1Q13") and FY13, respectively.

### (3)    *Failed to Record Bonus Expense*

121.    Defendants caused the Company to fail to record bonus expenses of $1.8 million that were paid in 2014 which should have been, but were not, recorded as an accrued expense for FY13 in violation of ASC Topic 710-10, *Salaries, Wages, and Bonuses*, which requires compensation to be accrued during the performance period.

122.    Additionally, Defendants caused the Company to fail to record annual bonuses of $5.8 million, in accordance with the Company's accounting policy of accruing estimated bonuses throughout the year, but which were not so recorded.

### (4)    *Deferred Accounting for Stock Awards Granted*

123.    The documentation of awards granted to the Company directors provided for accelerated vesting of shares upon voluntary resignation of the directors.  As a result, there was no

required service period for the vesting of such awards.  GAAP require that the full amount be

expensed in accordance with ASC Topic 718, *Compensation-Stock Compensation*, which requires

such compensation to be expensed over the service period.  Thus, awards that vest immediately

should be recognized at the grant date.  In connection with the restatement, the Company corrected

this accounting by recording $3.3 million as a general and administrative expense during 1Q14,

which had not been properly recorded in the correct period.

*(5)*     ***Deferred General and Administrative Expenses***

124.    Defendants have caused the Company to restate its financial statements to reflect

general and administrative expenses that were recorded in an incorrect period.  This correction

required the recordation of additional general and administrative expenses of $1.7 million and $0.9

million in 1Q14 and 2Q14, respectively.

### *(6)    Deferred Depreciation and Acquisition Related Expenses*

125.    The Company's 1Q14 depreciation expense and acquisition related expenses were under expensed by $2.3 million and $0.6 million, respectively, based on its accounting for certain properties acquired in 2013.   The Company had delayed recording these amounts until 2Q14 instead of in 1Q14.   The Company also did not properly record $6.0 million of depreciation expense for real estate properties acquired during 1Q14, that had also been expensed in 2Q14 instead of 1Q14.

### *(7)    Deferred Interest Expense*

126.    Defendants have caused the Company to understate interest expense related to a swap by $1.4 million in 1Q14, in violation of ASC Topic 835, *Interest*.

### *(8)    ARCP Improperly Capitalized Expenses*

127.    Defendants caused the Company to improperly capitalize expenses as assets and improperly amortize them over time rather than properly expensing them at the time they were incurred because ASC Topic 805, *Business Combinations*, requires that acquisition-related costs be recorded as expenses in the periods in which the costs are incurred.   As a result, Defendants caused the Company to record assets so that they would slowly be depreciated over the estimated life of the asset, rather than expensed immediately as incurred as was required, which resulted in an artificial inflation in ARCP's reported financial performance.

128.    On multiple occasions, Defendants caused the Company to record the supposed acquisition of furniture, fixtures and equipment ("FF&E") from other Schorsch-controlled entities when there was "***no evidence***" to substantiate the existence of any such assets.   Defendants caused the Company to originally capitalize $4.1 million of FF&E costs and expense $1.7 million of costs in 1Q13.   However, there was no evidence of the receipt of any FF&E and the Company has now

acknowledged it could not support the value of the FF&E purportedly acquired.  This occurred again in 1Q14 upon consummation of the ARCT IV merger, resulting in the improper capitalization of $2.1 million in that quarter.  As part of the restatement, Defendants caused the Company to expense the amounts originally capitalized – $4.1 million and $2.1 million – and recognize the expenses in merger and other non-routine transaction-related expense in 1Q13 and 1Q14, respectively.

*(9)   Failure to Write Down the Value of Impaired Assets*

129.    Defendants caused the Company to belatedly perform a detailed analysis of the portfolio in connection with the restatement and then noted there were four properties with impairment indicators, which was a prior violation of GAAP.  In violation of ASC 360-10-35-21, *Property, Plant and Equipment*, ARCP "failed to monitor events and changes in circumstances that could indicate that the carrying amount of its real estate and related assets may not be recoverable."    The Company assessed the recoverability of the carrying amounts of such properties as of the date in which such indicators existed.  Based on this assessment, the Company noted two properties with carrying amounts in excess of their expected undiscounted cash flows.  As a result, the Company reduced the carrying amount of the real estate and related net assets to their estimated fair values by recognizing an impairment loss of $2.1 million and $3.3 million for 3Q13 and FY13, respectively, in accordance with ASC 360-10-35-21, which requires that an impairment loss be measured as the amount by which the carrying amount of a long-lived asset exceeds its fair value.

130.    Defendants caused the Company to improperly classify certain property as held for sale as of June 30, 2014.  GAAP ASC 360-10-35-43 requires that a long-lived asset classified as held for sale be measured at the lower of its carrying amount or fair value less cost to sell.  In

connection with the restatement, the Company classified the property as held for sale, adjusted the fair value of the property at that date and recognized a loss on held for sale assets of $1.8 million for 2Q14.

### (10)    *Equity Awards Exceeded Limitations Set by the Compensation Committee*

131.    As the Company later admitted, equity awards made to Schorsch and Block in connection with the Company's transition from external to internal management were altered such that they "contained vesting provisions that, as drafted, were more favorable to them than the Compensation Committee had authorized."  ARCP adopted the OPP, notwithstanding a 67.6%, non-binding, shareholder vote rejecting the 2014 Multi-Year Outperformance Plan (the "OPP") and a May 16, 2014, Institutional Investor Services ("ISS") report criticizing the plan.  As the ISS explained, the OPP plan was not "rigorous relative to the potential payout values." ARCP nevertheless adopted the OPP, with a recently disclosed December 12, 2014, agreement between Schorsch and ARCP revealing an "Award Agreement dated January 8, 2014, under the ARCP 2014 Multi-Year Outperformance Plan."  Through this OPP – as well as various other forms of compensation, director fees, and profit arrangements that accompanied each acquisition – ARCP executives personally profited from their fraud.

132.    In addition, the OPP, approved by the Compensation Committee, contained a maximum award pool opportunity based upon the Company's equity market capitalization as ***of the date of the approval of the OPP in October 2013***, equaling approximately $120 million.  Yet, the Officer Defendants implemented the OPP with a maximum award pool of approximately $100 million greater, which was derived from a pro forma equity market capitalization as of January 8, 2014.  These manipulations resulted in a decrease of $8.4 million to stock-based compensation

reported in general and administrative expense for the six months ended June 30, 2014 – $6.3 million in 1Q14 and $2.2 million in 2Q14.

### (11)    *Misclassification of Expenses*

133.    Defendants caused the Company to misclassify ordinary business expenses (*i.e.*, operating expenses) as merger and other non-routine transaction-related expenses in order to inflate AFFO and to falsely assure investors that these expenses were not routine in nature and would not be recurring in future accounting periods.  As a result of the mischaracterization of operating expenses as expenses that would not continue in future periods, AFFO was inflated and misled investors to believe that such expenses would not have a negative impact on future profits.

### (12)    *General & Administrative*.

134.    Defendants caused the Company to improperly classify $75.7 million of general and administrative expenses as "merger-related" in FY13 – specifically, $5.4 million, $0.4 million, $0.3 million and $69.6 million in 1Q13, second quarter of 2013 ("2Q13"), third quarter of 2013 ("3Q13") and fourth quarter of 2013 ("4Q13"), respectively.  Defendants also caused the Company to improperly classify $14.5 million of general and administrative expenses as "merger-related" in the six months ended June 30, 2014 – $9.4 million in 1Q14 and $5.2 million in 2Q14.  The largest factor of the amount misclassified in FY13 was $59.6 million of equity-based compensation expense relating to the OPP.

### (13)    *Management Fees*.

135.    On multiple occasions, Defendants caused the Company to improperly classify management fees paid to affiliates as being merger and other non-routine transaction-related, which masked related-party transactions in violation of ASC Topic 850, *Related-Party Disclosures*, and gave investors the false impression that such expenses were not routine in nature.

The Company identified $13.0 million and $13.9 million of management fees that were improperly classified as merger and other non-routine transaction-related expenses in 1Q13 and 1Q14, respectively.  As restated, the expenses were accurately classified as management fees to affiliates.

### *(14)   Financing Costs were Deferred*

136.   Defendants caused the Company to improperly record as merger and other non-routine transaction-related expenses, costs that should have been capitalized as deferred financing costs and amortized accordingly in the amount of $1.0 million, $1.2 million, $5.9 million, $20.6 million and $0.8 million for the periods 1Q13, 3Q13, FY13, 1Q14 and 2Q14, respectively.  As such, adjustments to properly record and amortize the deferred financing costs were made in the restatement.  As a result of capitalizing these deferred financing costs, additional interest expense of $0.6 million (1Q13), $2.3 million (FY13), $8.7 million (1Q14), and $1.3 million (2Q14) was recorded.  And related extinguishment of debt expense of $2.3 million and $0.9 million was recorded in 1Q14 and 2Q14, respectively.

### *(15)   Accounting for Losses on Disposals and Goodwill*

137.   The Company's improper accounting for losses on disposal and goodwill violated GAAP.  *See* ASC Topic 350, *Intangibles – Goodwill and Other, ASC Topic 360, Property, Plant, and Equipment*, ASC Topic 610, Other Income, and ASC Topic 805, Business Combinations. After the CapLease merger in 2013, the Company disposed of certain properties acquired in that acquisition.  The disposition of such properties resulted in a net loss on disposition; however, the Company improperly accounted for such losses by adjusting its purchase price allocation to increase the amount of goodwill and decrease the associated real estate investments recorded in connection with the CapLease merger by $12 million.  ***Defendants have admitted that they lacked the evidence to support adjusting its goodwill as a measurement period adjustment***.  As a result,

50

in connection with the restatement, the Company has reversed the measurement period adjustments that were made to goodwill and related assets and liabilities acquired in the CapLease merger and recognized a net loss on the dispositions in 2014 when the dispositions occurred.

138.    Similarly, in 1Q14, subsequent to both the CapLease and Cole mergers, the Company disposed of certain properties acquired in those mergers.   The disposition of such properties resulted in a net loss on disposition in 1Q14 and a net gain in 2Q14; however, the Company incorrectly adjusted its purchase price allocation by increasing its goodwill recorded in connection with the mergers by $13.6 million in 1Q14 and by $2.6 million in 2Q14.  ***The Company has admitted that it lacked the evidence to support adjusting its goodwill as a measurement period adjustment***.  As a result, the Company reversed the measurement period adjustments that were made to goodwill and recognized a net loss on dispositions for 1Q14 and a net gain on disposition for 2Q14.

139.    In addition, the Company recorded a decrease to goodwill of $0.6 million for FY13 to reflect valid measurement period adjustments that were identified subsequent to the initial purchase price allocation.  The Company also identified certain liabilities assumed and subsequent payments of such liabilities by the former manager from the CapLease merger that were not recorded properly.  To correct the inaccurate accounting, the Company has increased goodwill by $3.0 million, decreased merger and non-routine transaction-related expenses by $0.7 million and increased the equity contributions by $2.3 million.

140.    Furthermore, the Company assigned goodwill associated with certain mergers to the Company's Real Estate Investment segment.  However, the Company determined that it did not properly account for disposals of real estate because a portion of goodwill was not included in the carrying amount of the associated real estate in its determination of the gain or loss on

disposition.  To correct the inaccurate accounting, the Company allocated $7.0 million and $2.2 million of goodwill to real estate dispositions in 1Q14 and 2Q14, respectively, which increased the loss on disposition of properties recognized.

### (16)    Further Accounting Manipulations

141.    In addition to the numerous GAAP violations described above, Defendants caused the Company to engage in a number of other accounting improprieties described in its amended SEC filings and corrected by the restatement including, but not limited to:

- failing to properly record distributions on long-term incentive plan units;

- improperly classifying amounts due to affiliates as accounts payable and accrued expenses, thereby concealing that these expenses were being paid to other Schorsch-controlled entities;

- improperly excluding certain expenses from the calculation of the net loss attributable to non-controlling interest holders;

- improperly accounting for gains/losses on derivative instruments (specifically, interest rate swaps);

- understating interest expense by improperly recording the same credit twice; and

- misclassifying interest expense, debt extinguishment costs and loss on disposition of properties expenses.

### (17)    The Company Overstated its AFFO

142.    The Company admitted in its amended SEC filings, that it had **materially misstated its FFO and AFFO for each and every year that ARCP has been a public company**, that is, fiscal years 2011, 2012 and 2013, and interim quarters ended March 31, 2013, June 30, 2013, September 30, 2013, March 31, 2014 and June 30, 2014.

143.    In addition to repeating many of the admissions set forth in the October 29, 2014 press release, the amended SEC filings acknowledge that the AFFO guidance ARCP issued was without reasonable basis, as "***the Company did not have appropriate controls over the***

*formulation of AFFO per share guidance or the periodic re-assessment of the Company's ability*

*to meet its guidance*."  (Emphasis added).

144.    The 2013 Amended Form 10-K included, in pertinent part, the following

admissions with respect to the Company's previously disclosed AFFO:

> The investigation found that Adjusted Funds From Operations
> ("AFFO"), a non-GAAP measure presented in the Company's SEC
> filings and other financial communications, was overstated for fiscal
> year 2011, fiscal year 2012, fiscal year 2013 (including each fiscal
> quarter of 2013) and, as previously disclosed in the October 29 8-K,
> the first two fiscal quarters of 2014. ***Senior management considered
> AFFO to be an important metric used by analysts and investors in
> evaluating the Company's performance and, for the first two
> quarters of 2014, sought to maintain reported AFFO within the
> 2014 guidance range of $1.13 to $1.19 per share announced at the
> end of 2013***.  The overstatements of AFFO were due in part to errors
> in reflecting amounts attributable to the limited partnership interests
> in the Company's operating partnership, ARC Properties Operating
> Partnership, L.P., held by holders other than the Company (known
> as non-controlling interests or "NCI").  ***Prior to the filing of the
> Quarterly Report on Form 10-Q for the first quarter of 2014, some
> members of senior management were aware of NCI errors but
> allowed the report to be filed without completing an analysis of the
> errors***.  In the Company's Quarterly Report on Form 10-Q for the
> second quarter of 2014, as previously reported in the October 29 8-
> K, ***the NCI errors in the first quarter were intentionally not
> corrected, and other AFFO and financial statement errors were
> intentionally made, resulting in an overstatement of AFFO and an
> understatement of the Company's net loss for the three and six
> months ended June 30, 2014***.  [Emphasis added].

**C.      The Company's Material Weakness in
         Internal Control Over Financial Reporting**

145.    The Company admitted that the AFFO and financial statement errors were caused

by its inadequate and deficient control environment.  Key controls necessary to ensure that the

Company's financial reporting complied with GAAP and that the financial information provided

was not materially misstated were not established.

146.    The 2013 Amended Form 10-K included the following admission regarding the

Company's material weaknesses:

> **Related Party Transactions and Conflicts of Interest** – The Company did not maintain the appropriate controls to assess, authorize and monitor related party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates.   Without the appropriate controls, the Company made certain payments to the Former Manager and its affiliates that were not sufficiently documented or that otherwise warrant scrutiny.
>
> **Equity-Based Compensation** – The Company did not maintain appropriate controls over various grants of equity-based compensation. In the fourth quarter of 2013, in anticipation of the Company's transition to self-management, the Company entered into employment agreements with the Company's former Executive Chairman and Chief Executive Officer and its former Chief Financial Officer, and also approved the 2014 Outperformance Plan pursuant to which awards were made to them on January 8, 2014. Without the appropriate controls, these documents contained terms that were inconsistent with the terms authorized by the Compensation Committee.   Additionally, the Company did not obtain copies of or administer the equity awards made by means of block grants allocated by the Former Manager and its affiliates, nor did the Company review the awards for consistency with the Compensation Committee's authorization.
>
> **Aggregation of Significant Deficiencies Within Business Process-Level Control Activities and Financial Reporting Controls** – The following significant deficiencies together constitute a material weakness:
>
> **Accounting Close Process** – The Company did not have consistent policies and procedures throughout its offices relating to purchase accounting, accounting for gain or loss on disposition and testing for impairment. In addition, senior management did not establish clear reporting lines and job responsibilities or promote accountability over business process control activities.
>
> **Critical Accounting Estimates and Non-Routine Transactions** – The Company did not maintain effective controls or develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management

review and approval of the accounting treatment of all critical and significant estimates on a periodic basis.

**Critical Accounting Estimates and Non-Routine Transactions** – The Company did not maintain effective controls or develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates on a periodic basis.

147.     The Company's massive restatement reveals that the Company's internal controls over financial reporting were plagued with pervasive material weaknesses as far back as at least 2013.  Defendants failed to: (a) establish controls designed to ensure that accounting employees would not be subject to pressure to make inappropriate decisions affecting the financial statements and/or the financial statement components of AFFO; (b) establish controls designed to ensure that accounting concerns raised by employees would be timely and appropriately addressed by senior management; (c) establish controls designed to prevent changes to the financial statements and supporting financial information by senior management without the proper levels of review, support and approval; (d) establish appropriate policies and procedures surrounding the accounting treatment and classification of merger-related expenses, goodwill, impairments and purchase accounting; and (e) emphasize the importance of adherence to the Company's Code of Business Conduct and Ethics.

## IV.     Grant Thornton's Audits and Reviews of ARCP's Audited and Unaudited Financial Position and Results of Operations Were Negligent, Reckless or Intentional and Breached its Contract With ARCP

148.     Grant Thornton is the U.S. member firm of Grant Thornton International Ltd., an international firm that provides independent audit, tax and advisory services.  Grant Thornton served as ARCP's outside auditor before, during and after the wrongdoing alleged herein.

149.   Furthermore, Grant Thornton served as ARCP's independent auditor and received

millions of dollars in payments from Schorsch-related entities[5] including nearly $1.6 million in

fees for its ARCP audit work in 2013, a 437% increase from the fees it received for such work in

2012.

150.   In connection with its 2012 and 2013 annual audits, Grant Thornton issued

unqualified audit opinions that certified ARCP's false and misleading financial statements

included in its Forms 10-K filed with the SEC for those periods.  Grant Thornton also consented

to including its 2012 and/or 2013 unqualified audit opinions in ARCP's Registration Statements

filed with the SEC in connection with the July 2013, December 2013, and September 2014 debt

offerings, the May 2014 equity offering, the Cole merger and the ARCT IV merger.

151.   Grant Thornton's unqualified, or "clean," audit reports certified ARCP's financial

statements as being free of material misstatements.[6]  Grant Thornton's audit reports, included in

---

[5]      These entities include ARCP, American Realty Capital Daily Net Asset Value Trust, Inc.,
American  Realty Capital Global Trust, Inc., American Realty Capital Healthcare Trust II, Inc.,
American  Realty Capital New York City REIT, Inc., American Realty Capital New York Recovery
REIT, Inc.,   American Realty Capital – Retail Centers of America, Inc., and American Realty
Capital Trust V,   Inc.

[6]      In *In re American Realty Capital Properties, Inc. Litig.*, Case 1:15-cv-02934-AKH, 2015
WL 6869337, at *4-5 (S.D.N.Y. Nov. 6, 2015), Judge Hellerstein refused to dismiss a related
securities class action complaint brought against ARCP and many of the same individual and other
defendants, including Grant Thornton, and instead granted plaintiffs leave to file a second amended
complaint.  See, *id.*  Subsequent to the filing of such second amended complaint (the "SAC"),
ARCP and the various other defendants, including Grant Thornton, moved to dismiss the SAC.
On August 5, 2016, Judge Hellerstein entered an Order Granting in Part and Denying in Part
Defendants Motions to Dismiss the Second Amended Complaint.  See, Case 1:15-cv-02934-AKH
(Doc. No. 28).  Of particular relevance to the instant action is Judge Hellerstein's findings
respecting Defendant Grant Thornton's motion to dismiss the SAC:

> Grant Thornton ("GT") moves to dismiss Counts I-VII of the complaint, on the
> ground that its opinion that ARCP's financial statements fairly reported ARCP's
> financial conditions and results of operations did not constitute a certification of the
> truthfulness of each and every component of those statements.  See *Omnicare Inc.
> v. Laborers Dist. Council Constr. Ind. Pension Fund*, 135 S. Ct. 1318, 1326-30
> (2015).  However, the SAC adequately alleges that GT was privy to information

ARCP's 2012 Form 10-K and 2013 Form 10-K, stated that ARCP's statement of financial position for the year under audit and the previous year, and its statement of the results of operations for the year under audit and the two previous years, presented "fairly" the financial position of ARCP "in conformity with accounting principles generally accepted in the United States of America."

152.    Grant Thornton's unqualified audit reports for the fiscal years ended December 31, 2012 ("FY12") and December 31, 2013 were materially false and misleading because ARCP's financial statements for FY12 and FY13 did not present fairly, in all material respects, the Company's results of operations or its financial condition in accordance with GAAP.

153.    Grant Thornton also reviewed and signed off on the unaudited final results reported by ARCP during the wrongdoing alleged herein, including the Company's reported FFO and AFFO.

154.    ARCP's unaudited financial results reported were also materially false or misleading and Grant Thornton's review and approval results were negligent or reckless.

155.    Grant Thornton, as the auditor of American Realty and an independent certified public accounting firm, owed a duty to ARCP to exercise that degree of due professional care, proficiency, and diligence required by reasonably prudent independent public accountants under the same or similar circumstances.

---

that plausibly challenged the reliability of ARCP's accounts and that Grant Thornton negligently failed to heighten its audit investigation.  SAC ¶¶ 59; 65. Enough is alleged to satisfy *Omnicare*.

*See id.* at p. 2.

The foregoing findings by Judge Hellerstein are applicable under *Omnicare* both to claims made under § 11 of the Securities Act of 1933 and to the common law tort of misrepresentation and, thus, should have preclusive effect as to the analogous common law tort claims made herein against Grant Thornton.

156.     Despite Grant Thornton's long-standing relationship with American Realty as the Company's auditor, its purported expertise in the REIT industry and knowledge of the importance of the AFFO and related party transactions to analysts and investors, Grant Thornton failed in its role as auditor, acted negligently, breached its contract with ARCP, and committed malpractice with respect to its audits and reviews of ARCP's financial position and results of operations, AFFO, related party transactions and other financial information.

### A.     Grant Thornton Negligently, Recklessly or Intentionally Violated PCAOB Auditing Standards

157.     Auditing standards have been established to ensure that external auditors fulfill their obligations when auditing and reviewing financial statements and other information contained in SEC filings.  These standards include those originally established by the American Institute of Certified Public Accountants ("AICPA"), which include, *inter alia*, ten basic standards that establish the objectives of a financial statement audit and provide guidance for the quality of audit procedures to be performed, as well as interpretations of these standards.[7] *See* AICPA Codification of Statements on Auditing Standards ("Au") 150.02.

---

[7]     The general, field work, and reporting standards (the 10 standards) approved and adopted by the membership of the AICPA, as amended by the AICPA Auditing Standards Board (ASB), are as follows:

**General Standards**

1.     The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

2.      In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

3.     Due professional care is to be exercised in the performance of the audit and the preparation of the report.

**Standards of Field Work**

158.    As a result of the Sarbanes-Oxley Act, the Public Company Accounting Oversight Board ("PCAOB") was created to oversee the audits of public companies, and has now adopted, amended, and expanded upon the auditing standards and interpretations previously issued by the AICPA (referred to by the PCAOB as "interim standards," and referred to herein as "AU ___"), and has also promulgated additional auditing standards (referred to herein as "AS ___").

159.    The Board has adopted as interim standards, on an initial, transitional basis, the generally accepted auditing standards, described in the AICPA Auditing Standards Board's

---

1.    The work is to be adequately planned and assistants, if any, are to be properly supervised.

2.    A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

3.    Sufficient appropriate evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

**Standards of Reporting**

1.    The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).

2.    The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

3.    Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

4.    The report shall contain either an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

4840-9062-2784, v. 1

Statement on Auditing Standards No. 95, Generally Accepted Auditing Standards, in existence on April 16, 2003. AS 1.

160.    PCAOB Rule 3100, *Compliance with Auditing and Related Professional Practice Standards*, requires the auditor to comply with all applicable auditing and related professional practice standards of the PCAOB. AS 1.

161.    An independent auditor plans, conducts, and reports the results of an audit in accordance with generally accepted auditing standards (GAAS). AU 150.01.  Auditing standards provide a measure of audit quality and the objectives to be achieved in an audit. *Id.*  Auditing procedures differ from auditing standards in that auditing procedures are acts that the auditor performs during the course of an audit to comply with auditing standards.  *Id.*

### B.    Grant Thornton Failed to Render an Accurate Audit Report with Respect to ARCP's 2013 Annual Financial Statements

162.    With respect to ARCP's financial statements for the year ended December 31, 2013, Grant Thornton acted negligently, breached its contract and committed malpractice by violating PCAOB Standard of Reporting No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP.[8]  Grant Thornton's opinion negligently represented that ARCP's financial statements for the year ended December 31, 2013 were presented in conformity with GAAP when they were not.

163.    The auditor's report must express an opinion on the financial statements taken as a whole and must contain a clear indication of the character of the auditor's work.  The auditor can determine that he is able to express an unqualified opinion only if he has conducted his audit in accordance with PCAOB Standards.[9]

---

[8]      AU § 508.04.

[9]      AU § 508.07.

164.    Grant Thornton issued its audit opinion dated February 27, 2014 on ARCP's 2013 financial statements. Grant Thornton's opinion stated that ARCP's financial statements were presented in conformity with GAAP and that Grant Thornton's audit was performed in accordance with PCAOB standards.  Grant Thornton did not render an accurate audit report for the Company's financial statements as of December 31, 2013, and thus did not exercise due professional care, because ARCP'S financial statements were not in conformity with GAAP, and because Grant Thornton failed to perform sufficient procedures to audit the Company's financial statements in accordance with PCAOB standards. Grant Thornton's statements with respect to ARCP's December 31, 2013 financials were negligently made because: (a) the financial statements had not been prepared in conformity with GAAP in numerous respects and did not present fairly, in all material respects, the financial position of ARCP as of December 31, 2013, and the results of the Company's operations and cash flow for the year ended December 31, 2013; and (b) Grant Thornton had not audited ARCP's 2013 financial statements in accordance with PCAOB standards.

165.    Additionally, Grant Thornton acted negligently, recklessly or intentionally in evaluating ARCP control over financial reporting and its disclosure controls and procedures and ARCP's unaudited financial results.

### C.    Grant Thornton Failed to Conduct the ARCP 2013 Audit in Accordance with PCAOB Standards

166.    PCAOB standards require auditors to exercise due professional care in the planning and performance of the audit and the preparation of the report.[10]  Auditors should be assigned and supervised commensurate with their level of knowledge, skill, and ability, so that they can evaluate

---

[10]    AU § 230.01.

4840-9062-2784, v. 1

the audit evidence they are examining.  The auditor with final responsibility for the engagement should know, at a minimum, the relevant accounting and auditing standards and should be knowledgeable about the client.[11]  Auditors must maintain an attitude of professional skepticism, which includes "a questioning mind and a critical assessment of audit evidence."[12]  In addition, the auditor should "consider the competency and sufficiency of the evidence.  Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process."[13]

### D.    Grant Thornton Failed to Exercise the Requisite Level of Care in Auditing ARCP's Long-Lived Assets

167.    Grant Thornton failed to exercise reasonable care in auditing ARCP's long-lived assets – real estate. The Company has admitted that its previously filed financial statements for the year ended December 31, 2013 ("2013 Financials") were materially misstated as a result of failure to take impairment charges related to long-lived assets. An auditor exercising reasonable professional skill and judgment would have discussed with the Company the policies and procedures which the Company used to identify asset impairments and would have determined, as admitted by the Company in the Restatement, that it "did not have consistent policies and procedures throughout its offices relating to . . . testing for impairment."

168.    Grant Thornton violated General Standard No. 3 and Standard of Field Work No. 3 by failing to exercise professional skepticism, including failing to obtain and critically assess audit evidence with respect to the existence of conditions indicating that an asset may have been impaired. *See* Accounting Standards Codification ("ASC") 360-10-35-21 for examples of

---

[11]     AU § 230.06.

[12]     AU § 230.07.

[13]     AU § 230.08.

circumstances that may indicate an asset may be impaired.  According to the Restatement, the Company "failed to monitor events and changes in circumstances that could indicate that the carrying amount of its real estate and related assets may not be recoverable."  Accordingly, Grant Thornton failed to exercise reasonable care, skill, prudence, and diligence generally recognized in the accounting profession by failing to uncover ARCP's lack of procedures and resulting misstatements, because of the materiality of the adjustments to the Company's long lived assets.

### E.  Grant Thornton Failed to Exercise the Requisite Level of Care in Auditing ARCP's Related Party Transactions Pertinent to ARCP's 2013 Financials

169.    PCAOB standards dealing directly with related-party transactions require that "an auditor should view related-party transactions within the framework of existing [accounting] pronouncements, placing primary emphasis on the adequacy of disclosure."[14]   An auditor exercising reasonable professional skill and judgment would have known that the audit of related parties is important because of (a) the requirement under GAAP to disclose material related party transactions and certain control relationships, (b) the potential for distorted or misleading financial statements in the absence of adequate disclosure, and (c) the instances of fraudulent financial reporting and misappropriation of assets that have been facilitated by the use of an undisclosed related party.

170.    Related parties may enter into transactions that give the appearance of having been conducted on an arm's-length basis in order to misrepresent the actual risk of the enterprise.  As such, the potential for fraud is significant because related party transactions provide an excellent opportunity to hide malfeasance.  By failing to record related party transactions or reveal their related party nature, insiders can easily use these transactions as vehicles for disguising

---

[14]     AU § 334.02.

compensation, misappropriating assets, and/or misstating financial statements. Even if misrepresentation is not intended, the nature of related party transactions is such that their terms may be more favorable than those attainable by an outside party. As a consequence, the economic reality of a particular business event may not be apparent without complete disclosure. Jack W. Paul, Ph.D., CPA, *Accounting Rules and Disclosures Portfolio 5148-2nd: Related Party Transactions Portfolio Description* at 2 (BNA).[15]

171.    The auditing interpretation to SAS No. 45 (AU § 334) states that the "risk associated with management's assertions about related party transactions is often assessed as higher than for many other types of transactions because of the possibility that the parties to the transaction are motivated by reasons other than those that exist for most business transactions." *Id.*

172.    To comply with PCAOB standards, Grant Thornton was required to evaluate all the information available concerning the related party transaction or control relationship and satisfy itself on the basis of professional judgment that it was adequately disclosed in the financial statements.[16] ARCP failed to disclose various related party transactions, only to disclose them in the Restatement, including: Management Fees to Affiliates; General and Administrative Expenses, including equity awards; and Amounts Due to Affiliates.

---

[15]    Dr. Paul is a licensed CPA in the state of Florida.  He is a professor of accounting at Lehigh University and has taught financial and intermediate accounting, auditing, advanced auditing, information systems, CPA review, and managerial cost accounting.  He is former director of the MS in accounting program at Lehigh University and teaches the capstone course in that program. He has obtained several grants for conducting accounting research and has published in a number of academic and practitioner journals.

[16]    AU § 334.11.

173.     Nevertheless, Grant Thornton issued an audit report on the 2013 Financials containing an unqualified opinion even though ARCP failed to properly disclose the material related-party transactions in its financial statements as required by GAAP. These audit failures by Grant Thornton were particularly egregious considering that it performed services for many other Schorsch-related entities which had engaged in transactions with ARCP.

174.     Grant Thornton also failed to exercise the requisite level of care or perform a critical assessment of the audit evidence. Well before the audit report was issued, Grant Thornton was aware that, as admitted by the Company, ARCP "did not maintain the appropriate controls to assess, authorize and monitor related party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates."[17]

175.     Grant Thornton failed to exercise an appropriate level of skepticism and failed to obtain sufficient competent evidential matter concerning related-party transactions and thus did not exercise due professional care. Indeed, the Company has admitted that "certain payments made by the Company to the Former Manager or its affiliates that were not sufficiently documented." An auditor exercising reasonable professional skill and judgment would have required more complete disclosure and, if such disclosure was not made, would have issued a qualified or adverse opinion – either of which would have prompted ARCP to take immediate action.

### F.     Grant Thornton Ignored the Risks of a Material Misstatement of ARCP's 2013 Financials

176.     According to PCAOB standards, the auditor must "perform risk assessment procedures that are sufficient to provide a reasonable basis for identifying and assessing the risks

---

[17]     ARCP 2013 10-K/A at 102.

of material misstatement, whether due to error or fraud, and designing further audit procedures."[18]

The PCAOB standards require the auditor to perform the audit in a manner calculated to obtain

such assurances.[19]  Thus, "audit procedures that are necessary to identify and appropriately assess

the risks of material misstatement include consideration of both external factors and company-

specific factors."[20]

177.    Risk assessments should be made with consideration of applicable risk factors.[21]

An auditor exercising due professional care would not have ignored the numerous risks relevant

to financial reporting, including events and circumstances that occurred or existed at ARCP which

adversely affected ARCP's ability to initiate, record, process, and report financial data consistent

with the assertions of management in the financial statements.

178.    Grant Thornton ignored a variety of risk factors relating to misstatements arising

from fraudulent financial reporting, such as unusually rapid growth or profitability.[22]  Grant

Thornton was well aware that ARCP experienced tremendous growth during the last few years,

with total assets increasing from $132 million at December 31, 2011 to over $21 billion at June

30, 2014.

179.    In the restatement, the Company admitted that as a result of the "large portfolio

acquisitions, the Company experienced significant growth and increases in the complexity of its

financial reporting and number of non-routine transactions," which "demanded an enhanced

---

[18]     AS No. 12, *Identifying and Assessing Risks of Material Misstatement* ¶4; *see also* AU §
316.01.

[19]     AU § 316.01.

[20]     AS No. 12 ¶5.

[21]     *See* AS No. 12 ¶65.

[22]     AU § 316.85.

control environment." During 2013, ARCP entered into three transactions: the transition to self-management, announced in August 2013; the acquisition of ARCT IV, announced in July 2013; and the acquisition of Cole, announced in October 2013. According to the Company, "the complexity of the Company's transactions and the need for accounting judgments and estimates became more prevalent and had a severe impact on the Company's control environment."

180.    Grant Thornton also ignored the "[d]omination of management by a single person," Defendant Schorsch, a risk factor relating to misstatements arising from fraudulent financial reporting.[23]    Grant Thornton was aware that Schorsch dominated the Company's Board, management, and financial reporting. Grant Thornton ignored Schorsch's "excessive participation in or preoccupation with the selection of accounting principles," a risk factor relating to misstatements arising from fraudulent financial reporting.[24]

181.    Grant Thornton also ignored that the Company was under pressure to meet "[p]rofitability or trend level expectations of investment analysts, institutional investors, significant creditors, or other external parties" – a risk factor relating to misstatements arising from fraudulent financial reporting.  According to the restatement, "[s]enior management considered AFFO to be an important metric used by analysts and investors in evaluating the Company's performance and, for the first two quarters of 2014, sought to maintain reported AFFO within the 2014 guidance range of $1.13 to $1.19 per share announced at the end of 2013," and as a result "the pressure of market expectations inherent in announcing AFFO per share guidance for 2014, demanded an enhanced control environment."

_____

[23]     AU § 316.85.

[24]     AU § 316.85.

182.    Grant Thornton failed to evaluate whether the Company's controls sufficiently addressed these identified risks of material misstatements due to fraud and whether the Company had controls intended to address the risk that management could override other controls. Controls that might address these risks include: (a) controls over related party transactions; (b) controls related to significant management estimates; and (c) controls that mitigate incentives for, and pressures on, management to falsify or inappropriately manage financial results.[25]   A reasonable auditor exercising reasonable care would not have ignored ARCP's emphasis on growth coupled with utterly flawed internal controls.

183.    Grant Thornton also did not exercise reasonable care in not knowing that the Company had failed to implement effective whistleblower provisions as required under Section 301 of Sarbanes-Oxley. Grant Thornton understood the critical importance of a whistleblower program, as discussed in an article entitled *Hear that whistle blowing! Establishing an effective complaint handling process*, written by a Grant Thornton partner.  The article in pertinent part, states:

> It is important to understand the role whistleblower complaint handling plays in deterring corporate fraud. Controls on the front end that prevent or deter fraud are critical — after all, the cheapest fraud is one that never happens.

184.    Grant Thornton was at least negligent in not knowing that ARCP's "Duty to Report" procedures which were in place at the time of the wrongdoing were ineffective because they called for reporting concerns of accounting or auditing matters "directly to the Chief Executive Officer of the Company" – which in this case was one of the persons whose control over the Company put the Company at risk.  Grant Thornton failed to exercise due care in not advising

---

[25]    40 AS No. 5 *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*.

the Company that it should "[e]stablish an 'early warning system' to bring accounting, internal accounting control and auditing matters to the attention of the audit committee in time to prevent, or detect and correct, possible problems before they cause serious harm or damage."[26]  Indeed, not until July 24, 2014 did the Company implement effective whistleblower procedures.

185.    Accordingly, Grant Thornton failed to exercise reasonable care, skill, prudence, and diligence generally recognized in the accounting profession by ignoring the risk factors relating to misstatements arising from fraudulent financial reporting. ARCP suffered from material weaknesses in internal controls, resulting in a variety of GAAP violations and improper reporting of AFFO.

### G.    Grant Thornton Failed to Obtain an Understanding of ARCP's Internal Controls

186.    Grant Thornton represented that "the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2013, based on criteria established in Internal Control-Integrated Framework issued by COSO." Contrary to Grant Thornton's assertions about the Company's internal controls, the restatement disclosed the following:

> In light of the findings of the Audit Committee's investigation and a review by the Company in connection with the preparation of the restatements, the Company's new management re-evaluated ***the Company's internal control over financial reporting and its disclosure controls and procedures and concluded that they were not effective at December 31, 2013.***  These material weaknesses had not been remediated, and additional material weaknesses in our internal control over financial reporting existed, at March 31, 2014, June 30, 2014 and September 30, 2014. In addition, at those dates, our disclosure controls and procedures were not effective. [Emphasis added].

---

[26]    *Id.*

187.    The restatement also disclosed that the Company suffered from material weaknesses in disclosure controls and procedures.

188.    Accordingly, Grant Thornton failed to exercise reasonable care, skill, prudence, and diligence generally recognized in the accounting profession by failing to uncover the multitude of material internal control weaknesses and rendering a materially false statement asserting that ARCP's internal controls over financial reporting were effective as of December 31, 2013, when in fact they were not effective.

**H.    Grant Thornton Failed to Exercise Reasonable Care
in Reviewing ARCP's Financial Information in its Interim Reports**

189.    Grant Thornton failed to exercise reasonable care in reviewing ARCP's financial statements for quarters ended March 31, 2014 and 2013, June 30, 2014 and 2013, and September 30, 2013, filed with the quarterly reports on Form 10-Q.  The SEC requires auditors to review a public company's interim financial information before the company files its quarterly report on Form 10-Q with the SEC for each of the first three quarters of the company's fiscal year.   In addition, certain issuers, pursuant to item 302(a) of Regulation S-K, are required to include selected quarterly financial data in their annual (and certain other) filings with the SEC.  Moreover, Grant Thornton failed to recognize a significant accounting change made by the Company in the fourth quarter of 2013, at a time when it was performing the Company's year-end audit.

190.    A review of a company's interim financial information is required for the fourth quarter for issuers, even though the company does not file a report on Form 10-Q for that quarter.

191.    AU Section 722, *Interim Financial Information*, requires that auditors conducting a review of interim financial information should perform, among other things:

- Inquiries concerning internal controls, especially changes in internal controls since the most recent financial statement audit or review;

- Reading the interim financial information for conformity with generally accepted accounting principles; and

- Inquiries of officers and other executives having responsibility for financial and accounting matters concerning whether the interim financial information has been prepared in conformity with GAAP consistently applied.

192.    AU Section 722 also states that the three general standards in AU Section 150.02 apply to reviews of interim financial information conducted in accordance with this section.

1.    The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

2.    In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

3.    Due professional care is to be exercised in the performance of the audit and the preparation of the report.

193.    The auditor should make inquiries and perform other review procedures when conducting a review of interim financial information, including:

Read other information in documents containing the interim financial information to consider whether such information or the manner of its presentation is materially inconsistent with the interim financial information. If the auditor concludes that a material inconsistency exists or becomes aware of information that the auditor believes is a material misstatement of fact, the auditor should take action based on the auditor's professional judgment.[27]

194.    In order to plan and conduct a review engagement, auditors should obtain an understanding of the entity and its environment, including its internal control as it relates to the preparation and fair presentation of both annual and interim financial information.[28]

---

[27]    AICPA *Interim Financial Information* AU-C §930.14.

[28]    AICPA *Interim Financial Information* AU-C §930.11.

4840-9062-2784, v. 1

I.      **Grant Thornton's Failures Related to
        ARCP's AFFO in its Interim Reports**

195.    As discussed above, ARCP improperly inflated AFFO in its interim reports filed in 2013 and 2014 through a variety of means including, among other things, changing its methodology of reporting its AFFO whereby it ceased pro-rating the added-back-to AFFO nonrecurring transaction and deferred financing costs and began to increase the AFFO by the entirety of the added-back costs, including the portion that should have been attributed to non-controlling interests in the operating partnership, ARC Properties Operating Partnership LP.

196.    Grant Thornton knew AFFO is a significant metric for REITs such as ARCP. In a December 4, 2013 article published by Grant Thornton titled "Evaluating REITs: FFO, AFFO or MFFO?" the firm acknowledged that "because of the unique features of the real estate industry, GAAP measures based on depreciation are not necessarily value relevant for REITs. Many investors therefore turn to non-GAAP metrics, which REIT industry groups support for use in communications to stakeholders and financial disclosures." (Footnotes omitted).

197.    Grant Thornton breached is contractual duties and was negligent in fulfilling its obligations to ARCP, particularly given the fact that McAlister specifically informed Grant Thornton of the accounting issues regarding the AFFO.

198.    Accordingly, Grant Thornton failed to exercise reasonable care, skill, prudence, and diligence generally recognized in the accounting profession by failing to uncover the improper AFFO reporting because of the materiality of the adjustments and the significance of AFFO to investors.

**J.**     **Grant Thornton Ignored Red Flags During its**
       <u>**Audit and Reviews of the 2014 Interim Financials**</u>

199.    Grant Thornton was also negligent in failing to conduct a further investigation of ARCP's financials in light of obvious red flags that the Company was engaged in accounting improprieties.

200.    First, the Company changed its methodology of reporting its AFFO relative to previous financial quarters in or around February 2014. This was at a time when Grant Thornton was engaged to perform the 2013 year-end audit.  A reasonably prudent independent public accountant under the same or similar circumstances exercising due professional care, proficiency, and diligence would have uncovered the change due to the materiality of AFFO to the Company and investors.  Grant Thornton knew the importance of AFFO, as the long-standing auditor of ARCP and its touted experience in the REIT industry.

201.    Second, during the second quarter of 2014, the Company changed the starting point of its AFFO calculation from "Net loss attributable to stockholders (in accordance with U.S. GAAP)," as reported in 1Q14, to "Net loss (in accordance with U.S. GAAP)."

202.    Despite the changes the Company made to AFFO during the second quarter of 2014, Grant Thornton failed to exercise reasonable care and diligence by failing to identify the inconsistencies and make additional inquiries of management and the Board.  During the October 30, 2014 shareholder/analyst call, the Company also admitted that the improper accounting was done "in order to conceal the error from the first quarter."

203.    The SEC permits companies to present non-GAAP financial measures in their periodic reports filed under the Securities Exchange Act of 1934, subject to compliance with

Regulation G,[29] 46 including press releases, investor presentations and conference calls, whether such disclosure is made in print, orally, telephonically, by webcast or by broadcast.

204.    Regulation G includes the following discussion regarding consistency of calculating and presenting non-GAAP financial measures:

> [R]egistrants should consider whether a change in the method of calculating or presenting a non-GAAP financial measure from one period to another, without a complete description of the change in that methodology, complies with the requirement of Regulation G that a registrant, or a person acting on its behalf, shall not make public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading.

205.    An auditor exercising reasonable professional skill and judgment would have read the other information contained in the Forms 10-Q and would have identified the inconsistencies and made additional inquiries, especially after being contacted by McAlister.  Moreover, owing to Grant Thornton's longstanding professional relationship with ARCP and the numerous other engagements performed, Grant Thornton was well aware of ARCP's methodology for calculating AFFO.

206.    Third, if the auditor becomes aware of matters involving identified or suspected noncompliance with laws and regulations whose effects should be considered when preparing interim financial information, the auditor should communicate the matters to those charged with governance.

---

[29]    Regulation G was adopted by the SEC in 2003, as part of Sarbanes-Oxley, requiring public companies that disclose or release such non-GAAP financial measures to include, in that disclosure or release, a presentation of the most directly comparable GAAP financial measure and a reconciliation of the disclosed non-GAAP financial measure to the most directly comparable GAAP financial measure. http://www.sec.gov/rules/final/33-8176.htm.

207.    Grant Thornton not only failed to comply with its own professional standards, but also breached its duty to the Company by failing to exercise that degree of due professional care, proficiency, and diligence required by reasonably prudent independent public accountants under the same or similar circumstances.  The Company, particularly the Audit Committee, relied on Grant Thornton to vet "any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or internal audit function."[30]

208.    Despite the foregoing, Grant Thornton failed to conduct further investigation of these suspicious circumstances while performing its quarterly review procedures.  Accordingly, Grant Thornton failed to exercise reasonable care in reviewing ARCP's financial statements.

209.    Further, Grant Thornton failed to, among other things, investigate ARCP's change in its reporting methodology for AFFO during the year ended December 31, 2013, and during the first quarter of 2014, when the Company reported non-controlling interests on a net basis, to the second quarter of 2014, when the Company started reporting non-controlling interests on a gross basis.

210.    Grant Thornton failed to comply with its own professional standards and with industry standards by failing to take appropriate action after becoming aware of information believed to be material misstatement of fact. The Company, particularly the Audit Committee, relied on Grant Thornton to vet "the quarterly financial statements . . ., including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of

---

[30]      Charter ¶ 11.

4840-9062-2784, v. 1

Operations."[31] Accordingly, Grant Thornton was negligent in not knowing the consequences of improper reporting of the AFFO.

### K.    Grant Thornton Failed to Adequately Review ARCP's Press Releases

211.    Grant Thornton also failed in its duty to adequately and properly review the Company's press releases during the period of wrongdoing alleged herein. The Company issued materially false and misleading earnings press releases, as a result of the inflated AFFO. According to the Audit Committee Charter, "[t]he Committee shall discuss with . . . the Independent Auditor the Company's earnings press releases (with particular focus on any "pro forma" or "adjusted" and other non-GAAP information) . . . ."

212.    Accordingly, Grant Thornton failed to exercise due care in its role as auditor because it was negligent in not knowing from its long-standing relationship as the Company's auditor, that: ARCP's financial statements were materially misstated as a result of the many GAAP violations; ARCP's AFFO was materially misstated since 2011; and ARCP suffered from material weaknesses in internal control over financial reporting.

### L.    Grant Thornton Suddenly Resigns Without Any Explanation

213.    As noted previously, Grant Thornton has been part of Schorsch's inter-connected empire since 2007 and performed audit and other accounting services for approximately 27 of Schorsch's entities.

214.    On January 22, 2015, Grant Thornton abruptly resigned as the Company's auditor. It also tendered its resignation at seven other Schorsch's inter-connected entities: ARC – Retail Centers of America Inc., ARC – Retail Centers of America II Inc., ARC Daily Net Asset Value

---

[31]     Charter ¶ 7.

4840-9062-2784, v. 1

Trust Inc., ARC Healthcare Trust II Inc., ARC Healthcare Trust III Inc., ARC New York City

REIT Inc. and ARC Realty Finance Trust Inc.  No reason was given for its resignation.

> **M.     Defendants Schorsch, Kay, and Beeson, Are Allowed to Collect**
> **Compensation and Accrued Benefits Despite Their Disastrous**
> **Tenures with the Company**

215.    A void of leadership was created at the Company when it announced on December

15, 2014 that its entire management team stepped down, which came as a shock to the Company's

shareholders.  Specifically, the Company announced that Schorsch and Kay, who had had only

recently replaced Schorsch as CEO in the fall, resigned, along with Beeson.

216.    Instead of immediately terminating each of these executives with cause, the Board

allowed these executives, along with Block and McAlister, to voluntarily resign and collect hefty

compensation packages and accrued benefits.

217.    According to the Company's most recent Proxy Statement (Schedule 14A), as part

of Schorsch's resignation from his positions with the Company, the Partnership and the other

entities,  the net total 2014 compensation Schorsch received was $13.8 million, which consisted

of: salary of $1 million; 1 million shares (subject to claw-back by the Company if in any

proceeding in which Mr. Schorsch is a party, after all appeals, he is found to have breached his

fiduciary duty of loyalty or is found to have committed or admits to fraud or misconduct by him,

in connection with his responsibilities as a director or officer of the Company) with a fair value on

the vesting date of $9 million; dividends on restricted shares of common stock of $2.15 million;

dividends on LTIP units of $741,822; accrued vacation of $193,194; and aggregate taxable fringe

benefits of $728,103.  Furthermore, Schorsch is entitled to receive: first-year premium of life

insurance policy; company-paid medical and dental for himself and his family for one year; and

reimbursement of certain expenses and accrued and vested benefits.   Notably, the Board allowed

4840-9062-2784, v. 1

Schorsch's indemnification agreement to remain in full force and effect, thereby obligating the Company to pay potentially millions of dollars to defend Schorsch in regulatory investigations and related litigation.

218.    According to the Company's Proxy Statement (Schedule 14A), as part of Kay's resignation from the Company, the net total 2014 compensation Kay received was $1.4 million, which consisted of: salary of $627,917; dividends on restricted shares of common stock of $333,816; dividends on LTIP units of $171,330; and accrued vacation of $113,320.  Notably, the Board allowed Kay's indemnification agreement to remain in full force and effect, thereby obligating the Company to pay potentially millions of dollars to defend Kay in regulatory investigations and related litigation.

219.    According to the Company's Proxy Statement (Schedule 14A), as part of Beeson's resignation from the Company, the net total 2014 compensation Beeson received was $710,533, which consisted of: salary of $480,000; dividends on restricted shares of common stock of $88,020; dividends on LTIP units of $70,937; accrued vacation of $63,063; and 401(K) Company match of $8,513.   Notably, the Board allowed Beeson's indemnification agreement to remain in full force and effect, thereby obligating the Company to pay potentially millions of dollars to defend Beeson in regulatory investigations and related litigation.

220.    The decision to allow Schorsch, Kay, and Beeson to collect a hefty compensation package and accrued benefits is not a protected business judgment.   These payments were undeserved and not aligned with the Company's shareholders' interests.   Furthermore, the Board's decision to allow the indemnification agreements of Schorsch, Kay, and Beeson to remain in full force and effect, thereby obligating the Company to pay potentially millions of dollars to defend

4840-9062-2784, v. 1

them in regulatory investigations and related litigation is not a protected business judgment in light

of their wrongdoing.

### N.    False and Misleading Proxy Statements

**The May 4, 2012 Proxy**

221.    On May 4, 2012, the Company filed with the Securities Exchange Commission (the

"SEC") a definitive proxy statement in advance of the 2012 annual meeting of stockholders to be

held June 6, 2012.   The May 4, 2012 proxy statement expressly incorporated by reference the

Company's 2011 Form 10-K.   The proxy statement also stated in relevant part:

**Oversight of Conflicts of Interest**

The Company does not have a standing conflicts committee. Instead, the entire
Board of Directors, including our independent directors, is responsible for
approving transactions, and resolving other conflicts of interest, between the
Company and its subsidiaries, on the one hand, and ARC, any director, the Manager
or their respective affiliates, on the other hand. The Board of Directors is
responsible for reviewing and approving all transactions with affiliated parties, all
purchase or leases of properties from or sales or leases to an affiliate, and reviewing
and approving all agreements and amendments to agreements between the
Company and affiliates, including ARC or the Manager and their subsidiaries.

During the fiscal year ended December 31, 2011, all of the members of the Board
of Directors reviewed our policies and report that they are being followed by us and
are in the best interests of our stockholders. Certain of the factors considered by the
Board of Directors are set forth in the financial statements (including the notes
thereto) and Risk Factors contained in our Annual Report on Form 10-K for the
year ended December 31, 2011. The Board reviewed the material transactions
between ARC, the Manager and their respective affiliates, on the one hand, and us,
on the other hand, which occurred during the fiscal year ended December 31, 2011.
The Board has determined that all our transactions and relationships with ARC, the
Manager and their respective affiliates during the fiscal year ended December 31,
2011 were fair and were approved in accordance with the policies referenced in
"Certain Relationships and Related Transactions" below.

222.    On June 12, 2012, the Company filed a Form 8-K disclosing the results of the

shareholder votes solicited in the May 4, 2012 Proxy Statement.   Defendants Schorsch, Weil, and

Rendell were elected to one year terms on the Board.   The re-election of Defendants Schorsch,

Weil, and Rendell was an essential causal link in their continued breaches of fiduciary duties as detailed herein.  Any reasonable investor would have found it material in deciding how to vote that: (a) AFFO was being improperly manipulated; (b) the Company's financial results were incorrect; and (c) the Board was not adequately discharging its function in oversight of conflicts of interest as claimed by the proxy statement.

**The April 30, 2013 Proxy**

223.   On April 30, 2013, the Company filed with the SEC its definitive proxy in advance of the 2013 annual meeting of shareholders to be held June 4, 2013.  The April 30, 2013 Proxy expressly incorporates by reference the 2012 Form 10-K.  The proxy statement also stated in relevant part:

**Oversight of Conflicts of Interest**

The Company does not have a standing conflicts committee. Instead, the entire Board of Directors, including our independent directors, is responsible for approving transactions, and resolving other conflicts of interest, between the Company and its subsidiaries, on the one hand, and ARC, any director, the Manager or their respective affiliates, on the other hand. The Board of Directors is responsible for reviewing and approving all transactions with affiliated parties, all purchase or leases of properties from or sales or leases to an affiliate, and reviewing and approving all agreements and amendments to agreements between the Company and affiliates, including ARC or the Manager and their subsidiaries.

During the fiscal year ended December 31, 2012, all of the members of the Board of Directors reviewed our policies and report that they are being followed by us and are in the best interests of our stockholders. Certain of the factors considered by the Board of Directors are set forth in the financial statements (including the notes thereto) and Risk Factors contained in our Annual Report on Form 10-K for the year ended December 31, 2012. The Board reviewed the material transactions between ARC, the Manager and their respective affiliates, on the one hand, and us, on the other hand, which occurred during the fiscal year ended December 31, 2012. The Board has determined that all our transactions and relationships with ARC, the Manager and their respective affiliates during the fiscal year ended December 31, 2012 were fair and were approved in accordance with the policies referenced in "Certain Relationships and Related Transactions" below.

224.    On June 10, 2013, the Company filed a Form 8-K disclosing the results of the shareholder votes solicited in the April 30, 2013 Proxy.  Defendants Schorsch, Weil, Kahane, Michelson, Rendell, and Bowman were elected to one year terms on the Board.  The re-election of these six (6) defendants was an essential causal link in their continued breaches of fiduciary duties as detailed herein.  Any reasonable investor would have found it material in deciding how to vote that: (a) AFFO was being improperly manipulated; (b) the Company's financial results were incorrect; and (c) the Board was not adequately discharging its function in oversight of conflicts of interest as claimed by the April 30, 2013 Proxy.

**The April 29, 2014 Proxy**

225.    On April 29, 2014, the Company filed with the SEC its April 29, 2014 Proxy in advance of the 2014 annual meeting of stockholders to be held May 29, 2014.  Pursuant to the April 29, 2014 Proxy, votes were solicited to: (a) elect certain directors, including Defendants Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, and Stanley, to one-year terms; (b) ratify the Audit Committee's choice as independent auditor; (c) adopt a non-binding advisory resolution approving executive compensation for ARCP's executive officers; and (d) adopt a non-binding resolution regarding the frequency of the ratification of executive compensation. The April 29, 2014 Proxy expressly incorporated by reference the 2013 Form 10-K.  The April 29, 2014 Proxy statement also stated in relevant part:

**Conflicts Committee**

During the fiscal year ended December 31, 2013, the Company did not have a standing Conflicts Committee. Pursuant to the terms of the Company's Agreement and Plan of Merger with Cole and Clark Acquisition, LLC (the "Cole Merger Agreement"), effective with the close of the Company's acquisition of Cole (the "Cole Merger"), on February 7, 2014, the Company adopted an amendment to its bylaws by which it established a Conflicts Committee. The Conflicts Committee is composed of Messrs. Michelson, Stanley, Andruskevich and Sealy. A majority of the Conflicts Committee must approve any material contracts and transactions

between the Company and AR Capital, LLC and its affiliates (subject to certain exceptions) and the Conflicts Committee has the power to monitor compliance with certain self-management requirements specified by the Cole Merger Agreement.

The entire Board of Directors will review transactions that remain outside of the scope of the Conflicts Committee's purview and, should certain conflicts arise with management or the non-executive directors, the independent directors will review such transactions. The Board of Directors is responsible for reviewing and approving all transactions with affiliated parties, all purchases or leases of properties from or sales or leases to an affiliate and reviewing and approving all agreements and amendments to agreements between the Company and any affiliates.

During the fiscal year ended December 31, 2013, all of the members of the Board of Directors reviewed our policies and report that they are being followed by us and are in the best interests of our stockholders. Certain of the factors considered by the Board of Directors are set forth in the financial statements (including the notes thereto) and Risk Factors contained in our Annual Report on Form 10-K for the year ended December 31, 2013. The Board reviewed the material transactions between AR Capital, LLC, our former Manager and their respective affiliates, on the one hand, and us, on the other hand, which occurred during the fiscal year ended December 31, 2013. The Board has determined that all our transactions and relationships with AR Capital, LLC, our former Manager and their respective affiliates during the fiscal year ended December 31, 2013 were fair and were approved in accordance with the policies referenced in "Certain Relationships and Related Transactions" below.

226.    On June 2, 2014, the Company filed a Form 8-K disclosing the results of the shareholder votes solicited in the April 29, 2014 Proxy.  Defendants Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, and Stanley were elected to one year terms on the Board.  The re-election of these defendants was an essential causal link in their continued breaches of fiduciary duties as detailed herein.  Any reasonable investor would have found it material in deciding how to vote that: (a) AFFO was being improperly manipulated; (b) the Company's financial results were incorrect; and (c) the Board was not adequately discharging its function in oversight of conflicts of interest as claimed by the proxy statement.

## VI.   <u>DAMAGES TO AMERICAN REALTY</u>

227.    The Company's business prospects are detrimentally impacted as a result of the facts set forth above, including the accounting scandal resulting in the Company's massive restatement.  On November 3, 2014, it was announced that the board of directors of RCS decided to terminate its proposed $700 million agreement to purchase the Company's Cole private capital management business "in light of the disclosures made by ARCP."  The Company filed suit against RCS as a result of the deal termination.  The Company ultimately settled the matter but recovered a mere $60 million – far less than the expected proposed sale amount.  The Company lost a substantial part of the benefit of selling Cole and the Company is now saddled with a deteriorating asset.

228.    The Company's credit rating has been downgraded to a non-investment grade credit rating.  This affects the amount of capital the Company can access, as well as the terms of any financing it obtains.  Since the Company depends in part on debt financing to fund its growth, an adverse change in the Company's credit rating could have a negative effect on its financial condition and future growth and on transactions in which the Company must obtain debt capital at an advantageous cost.

229.    In addition, the Company's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  As noted by analyst Anthony Paolone, the Company's "credibility is likely impugned for some period of time" and that "capital costs will be higher in the near term . . . thus making growth more difficult."

230.    Additionally, the criminal and regulatory investigations and resulting litigation are ongoing.   They have caused, and will continue to cause, severe damage to the Company by Defendants' misconduct.  Further, as a direct and proximate result of Defendants' conduct, the

2784, v. 1

Company has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred from the SEC's investigation and resulting litigation;

(b)    costs incurred as a result of criminal and civil litigation against the Company and its executives;

(c)    costs incurred from the FBI's investigation;

(d)    costs incurred from the Company's internal investigation;

(e)    costs incurred resulting from the Company's massive restatement of its financial results;

(f)     costs incurred from compensation and benefits paid to Defendants that breached their duties to the Company; and

(g)    costs incurred to indemnify the wrongful acts of its former executives.

## VII.    DEMAND REFUSED ALLEGATIONS

231.    Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

232.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company because of Defendants' conduct as alleged herein.

233.    On August 28, 2015, Plaintiffs requested by letter (the "Demand Letter") that the Board create a committee composed of at least three (3) independent directors (the "Committee"), who have not been named as defendants in any shareholder derivative or securities fraud action and are not currently involved or threatened with in any litigation as a result of their affiliation with the Company, to investigate and be empowered with authority to take full corrective action

including, but not limited to, commencing legal proceedings against the following former and/or

current directors, executive officers and agents of the Company:  Schorsch, Kay, Weil, Stanley,

Rendell, Frank, Michelson, Bowman, Sealy, Beeson, Block and McAlister for the breaches of

fiduciary duties, unjust enrichment and corporate waste described below, and Grant Thornton for

negligence, breach of contract and accounting malpractice described herein.   *See* Exhibit A

attached hereto

234.    Plaintiffs also requested in the August 28, 2015 demand letter that the Board and

Committee consider and implement corporate governance reforms designed to address and prevent

the sort of wrongdoing described in the letter.  *See id.*

235.    On November 23, 2015, counsel for the Board refused Plaintiffs' demand stating

in relevant part:

> Similar demands previously have been made and refused, two of
> which are the subject of litigation, in *Witchko v. Schorsch*, No. 15-
> cv-06043 (S.D.N.Y.) and *Serafin v. Schorsch, et al.*, No. 15-cv-
> 08563 (S.D.N.Y.).  Most of the claims in your demand are addressed
> in the Board's publicly available June 18, 2015 response to the
> demand that is the subject of the Witchko action, and the Board's
> publicly available September 17, 2015 response to the demand that
> is the subject of the Serafin action, copies of which are attached to
> this letter. Exh. I (Letter from Charles O. Monk, II to Robert I.
> Harwood dated June 18, 2015); Exh. 2 (Letter from Charles O.
> Monk, II to Jeffrey M. Norton, et al., dated September 17, 2015).
>
> Against this backdrop, the Board discussed your demand on
> November 4, 2015.  Prior to the meeting, David Henry and Eugene
> Pinover, two new independent directors who were elected to the
> Board at the Company's Annual Shareholder Meeting on September
> 29, 2015, had previously been briefed on the demands made before·
> they joined the Board and the considerations that led the Board to
> refuse those demands.   At the meeting on November 4, 2015,
> members of the Board asked questions of Saul Ewing LLP,
> independent counsel to the Board, and engaged in a careful and
> thorough review and discussion of your demand.

After deliberation, the Board concluded, in the exercise of its business judgment, that the same considerations that led the Board to refuse prior demands, including the demands being litigated in the Witchko and Serafin actions, are equally applicable to your demand. The Board considered all of the factors noted in its letters refusing the Witchko and Serafin demands, but placed the most weight on (1) the likely negative impact that litigating the claims alleged in your demand at this time could have on the ongoing securities litigation and government investigations, assuming for the sake of argument that the claims have merit; and (2) the likelihood that the ongoing securities litigation and government investigations would yield more information concerning the claims alleged in your demand before the statute of limitations for bringing the claims would expire.  The Board then voted unanimously to refuse your demand at this time.

With respect to your demand that the Board create a Special Litigation Committee, Maryland law does not entitle shareholders to demand that the Board proceed with its responsibilities in any particular manner.  Similarly, with respect to your request for documents, the Board is not obligated to produce such documents.

*See* Exhibit B attached hereto.

236.   On January 11, 2016, Plaintiffs responded to the November 23, 2015 letter and stated in relevant part:

To support the Board's consideration and evaluation of the Shareholders' demand, you state that the Board asked questions and "engaged in a careful and thorough review and discussion" of the Shareholders' demand.  However, despite the Shareholders' request in their Demand, the Board failed to create a committee composed of independent directors who have not been named as previous defendants in any previous shareholder derivative or securities fraud actions and are not currently involved in any litigation as a result of their positions with the Company, to investigate the Shareholders' demand.  It appears that most of the directors who the Shareholders' alleged to have engaged in wrongdoing, are the directors that reviewed, discussed and ultimately refused the Shareholders' demand.

Furthermore, it appears the Board's refusal of the Shareholders' demand is improper because the Board failed to evaluate and investigate all of the Shareholders' allegations in their demand.  You request that the Shareholders adopt the Board's conclusions

regarding refusal of the previously made demands referenced in your letter; however, you concede that only "[m]ost of the claims" in the Shareholders' demand are addressed in the Board's responses to those demands.  Notably, detailed allegations with respect to the Company's auditor, Grant Thornton appear to be missing from the previous demands and are not addressed in your letter.  Specifically, the Shareholders' requested that the Company bring an action against Grant Thornton due to its negligence, malpractice and breach of contractual duties, and violation of PCAOB auditing standard and demand that Grant Thornton disgorge the fees paid to it by the Company.  Clearly, all of the Shareholders' allegations set forth in their Demand have not yet been properly considered by the Board in good faith.

Additionally, an exhibit attached to your letter references reports the Board received from Weil, Gotshal & Manges LLP and from the Company's outside counsel to the Company concerning the Audit Committee Investigation.  As a result of the Board's refusal of their Demand, the Shareholders request copies of these reports and any reports given to the Board or any Board committee in connection with the Shareholders' litigation demand in addition to any report prepared by the Board or any Board Committee.  It is imperative the Shareholders' receive this information as it will allow them to evaluate whether the Board's refusal of their demand was proper and made in good faith.

*See* Exhibit C attached hereto.

237.   Here, Plaintiffs have met their burden, and have shown adequately, at this point, that the business judgment rule will not support the Board's decision.  The relevant question is whether the Board acted on an informed basis in rejecting the demand.  The two-page Refusal letter (*see* Exhibit B attached hereto) (attaching the previous refusal letter in the *Witchko v. Schorsch*, No. 15-cv-06043 (S.D.N.Y.) action)[32] does not suggest that the Board weighed the potential recovery from the lawsuit in any detail, in a way that would allow them to compare it to

---

[32]   It should be noted that the Honorable Alvin K. Hellerstein of the Southern District of New York in the *Witchko* action issued an order denying the same defendants' motion to dismiss a demand refused complaint and thus defendants here are collaterally estopped to argue otherwise. *See* Exhibit D attached hereto.

the costs.  The Board did not produce a report to Plaintiffs, and the refusal letter does not suggest that the Board considered the specific merits of bringing suit against any of the Defendants. Indeed, it appears, based upon the lack of any statement to the contrary in the refusal letter, that the Board did not even investigate the merits of a lawsuit against Schorsch and his confederates. Rather, the Board simply stated in the refusal letter that it would not bring suit because of the pending class action, and pending government investigations related to the same misconduct.  If the mere existence of pending class action lawsuits and government investigations were enough to outweigh all other factors, a company's rights of action against errant officers and directors would be seriously compromised.  The Board's basis for refusing Plaintiffs' demand is simply not enough given the complexity of the decision and shows on its face that the Board's process was insufficient, and not an exercise of business judgment.

238.    Furthermore, the Board simply states in the refusal letter, without analysis, that filing an action against wrong-doing officers and directors would prejudice the Company.  That is not necessarily so.  The Company, and its officers and directors, will be subjected to extensive discovery proceedings in the existing class actions.  Very little additional discovery would have to be added because of a derivative lawsuit, and a stay of any such supplemental discoveries also could be appropriate.

239.    Further, the Board easily could and should have established a Special Litigation Committee but failed to do so.  Before deciding whether to accept or reject the shareholder's demand, a board ordinarily will appoint a special litigation committee, composed of disinterested directors, to investigate the merits of the shareholder's proposed claims and advise the board.  The Board's inexplicable decision not to do so makes this case one of those rare situations where a

company had every opportunity to create an independent special litigation committee but nonetheless failed to do so.

240.   The response letter suggests that the Board did not investigate and reach a conclusion on the theories of recovery stated in the Demand Letter.  No evidence has been provided to Plaintiffs that the Board did anything other than conduct an informal discussion regarding the Demand Letter.  The response letter does not indicate that the Board applied relevant law to facts. The response letter does not indicate that the Board evaluated the possible claims under the correct legal standards, or under any legal standards at all.  The response letter does not indicate that the Board even attempted to distinguish the relevant standards for liability in a breach of fiduciary action from the standards for liability in the federal securities class action.  *See* Exhibit B at p. 2 (not recognizing that a breach of fiduciary duty claim is distinct from a securities fraud claim, "assuming for the sake of argument that the claims have merit").  The response letter does not indicate that the Board conducted a sufficient investigation to inform itself whether the claims in the Demand Letter had merit.  In the response letter, the Board did not opine on whether, in its view, a breach of fiduciary duty claim could succeed, and if so, what damages might be available. Further, no other information has been supplied to Plaintiffs by the Board in response to the Demand Letter, other than the response letter.

241.   Also, the response letter does not indicate that either the Board or its counsel, Saul Ewing, created or produced a report on its investigation in response to the Demand Letter.  The response letter does not indicate that the Board interviewed anyone to evaluate the claims urged in the Demand Letter or review any documents to that end, either itself or through counsel.  No documentation at all has been provided to the Plaintiffs regarding the procedures and methodology used to evaluate the Demand Letter, including what, if any interviews were conducted, by whom,

who was interviewed, how many documents were reviewed, where they were obtained from, and who reviewed them.  As such, the Board's rejection of the Demand Letter was not reasonable under any applicable legal standard and the Board's refusal does not receive business judgment protection because it was not informed.

242.    The Refusal states that the Board refused the Demand Letter based on two considerations, neither of which were chosen on the basis of being informed about the merits of the claims: (i) "the likely negative impact on the claims alleged in your demand at this time could have on the  ongoing securities litigation and government litigations, assuming for the sake of argument that the claims have merit; and […] the  likelihood that the ongoing securities litigation and government investigations would yield more information concerning the claims alleged in your demand before the statute of limitations for bringing the claims would expire." *See* Exhibit B attached hereto.  Because the Board did not produce to Plaintiffs a report documenting its methodology and reasoning, it is unknown in what respect the Board believed the claims would have a negative impact on the Company's other legal problems.  Indeed, it was highly unlikely that the litigation and investigations would yield additional information before the statutes of limitations expired and the Board was at least reckless in not considering the likelihood of the statute of limitations expiring.  Having failed to adequately investigate, this decision lacked a proper basis.

243.    The Board's failure to convene an independent committee, conduct a reasonable investigation, evaluate the merits, apply correct legal standards, evaluate chances for a recovery, evaluate potential amounts recoverable, or create a report documenting its supposed investigation cannot be deemed a valid exercise of business judgment entitled to any presumption of reasonableness and good faith under the law.  No legal action has been filed by ARCP against any

90

of the Individual Defendants.   The primary architects of the accounting fraud and other wrongdoing detailed herein have been allowed to resign and retire, rather than being terminated for cause.   Accordingly, Plaintiffs' institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

244.   Plaintiffs have not made any demand on the other shareholders of ARCP to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)   ARCP is a publicly held company with over 905 million shares outstanding and thousands of shareholders;

(b)   Making a demand on such a number of shareholders would be impossible for Plaintiffs who has no way of determining the names, addresses, or phone numbers of the other shareholders; and

(c)   Making a demand on all shareholders would force Plaintiffs to incur excessive expenses, assuming all shareholders could be individually identified.

## VIII.   CAUSES OF ACTION

### COUNT I

### AGAINST ALL DEFENDANTS FOR NEGLIGENT BREACH OF FIDUCIARY DUTY OF FULL DISCLOSURE

245.   Plaintiffs incorporate by reference and re-allege each allegation set forth above, as though fully set forth herein.

246.   Each of the Defendants is serving or has served as a director or an officer of the Company and as such owed to the Company the highest fiduciary duties of loyalty, good faith, candor, due care and full disclosure.   Each of the Defendants had a duty to ensure that the Company disseminated accurate, truthful, and complete information to its shareholders and exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

4840-9062-2784, v. 1

247.    Each of the Defendants negligently breached their duties of loyalty, good faith, candor, due care and full disclosure by causing or allowing the Company to violate the law and disseminate to the Company shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

248.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' actions in an amount at least as much as Seventy-Five Thousand Dollars ($75,000.00);

B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

C.    Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.


# COUNT II

## AGAINST ALL DEFENDANTS FOR NEGLIGENT BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

249.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

250.    As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were accurate, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

251.    Defendants negligently breached their fiduciary duty by ignoring the obvious and pervasive problems with American Realty's accounting and internal control practices and procedures and failing to make a good faith effort to correct the problems or prevent their recurrence.

252.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' actions in an amount at least as much as Seventy-Five Thousand Dollars ($75,000.00);

B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

C.    Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.


## COUNT III

### AGAINST DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14A-9

253.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

254.    Rule 14a-9 was enacted pursuant to § 14(a) of the Securities Exchange of 1934, and provides in relevant part:

> "No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."

255.    In this case, the Company's Proxy statements filed on May 4, 2012, April 30, 2013, and April 29, 2014 violated § 14(a) and Rule 14a-9 because each omitted material information regarding Defendants' wrongful conduct, and included by reference materially false and misleading financial statements.

256.    Defendants caused the Company to issue the 2012 Proxy, the 2013 Proxy and the 2014 Proxy containing false and misleading information and/or failed to disclose material adverse information about the Company.  This false and misleading information and/or omitted material adverse information included:

(a)     The AFFO was being improperly manipulated;

(b)     The Company's financial results were inaccurate; and

(c)     The Board was not adequately discharging its function in oversight of conflicts of interest as represented by each of the three proxy statements.

257.    In the exercise of reasonable care, Defendants should have known that the statements contained in the 2012 Proxy, the 2013 Proxy and the 2014 Proxy were materially false and misleading.

258.    The misrepresentations and omissions in the 2012 Proxy, the 2013 Proxy and the 2014 Proxy were material to Company shareholders in voting on each of these proxies.

259.    As a proximate result of Defendants' material misrepresentations and omissions in the 2012 Proxy, the 2013 Proxy and the 2014 Proxy, the Company was damaged.

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' actions in an amount at least as much as Seventy-Five Thousand Dollars ($75,000.00);

B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

C.    Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## COUNT IV

## <u>AGAINST ALL DEFENDANTS FOR CONSTRUCTIVE FRAUD</u>

260.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

4840-9062-2784, v. 1

261.    Defendants, by reason of their positions as a director and/or officer of the Company, controlled the business and activities of the Company and such owed to the Company the highest fiduciary duties of loyalty, good faith, candor, and due care.

262.    Defendants' breaches of their fiduciary duties constitute constructive fraud because they breached their fiduciary duties through conduct which deceived.

263.    Defendants' breaches of their fiduciary duties constitute constructive fraud because they breached their fiduciary duties through conduct which injured the public interest in the existence of accurate market information and in ensuring public confidence in financial reporting of publicly traded companies.

264.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, Defendants acted willfully and contrary to the best interest of the Company.  As a result, the Company has sustained damages.

265.    Defendants acted intentionally, with malice, and/or with reckless disregard by causing or allowing the Company to, *inter alia*, violate the law and disseminate to the Company shareholders materially misleading and inaccurate information.  Alternatively, Defendants acted negligently by causing or allowing the Company to, *inter alia*, violate the law and disseminate to the Company shareholders materially misleading and inaccurate information.

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' actions in an amount at least as much as Seventy-Five Thousand Dollars ($75,000.00);

B.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

C.      Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## COUNT V

## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

266.    Plaintiffs incorporate by reference and re-allege each allegation set forth above, as though fully set forth herein.

267.    By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

268.    As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

269.    Because of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

270.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants

4840-9062-2784, v. 1

caused the Company to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged American Realty.  The Company suffered actual damages as a result of said mismanagement.  Defendants' conduct was characterized by evil motive, intent to injure, ill will or fraud.  Accordingly, the Company is entitled to recover punitive damages with respect to this Count.

  **WHEREFORE**, Plaintiffs demand judgment as follows:

  A. Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' actions in an amount at least as much as Seventy-Five Thousand Dollars ($75,000.00), including punitive damages in an amount to be determined;

  B. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

  C. Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

  D. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

  E. Granting such other and further relief as the Court deems just and proper.

## COUNT VI

## NEGLIGENCE AGAINST DEFENDANT, GRANT THORNTON

271.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein. Grant Thornton conducted its audit of the Company's annual financial statements and prepared its audit reports for the benefit of the Company, its management, directors and stockholders.  Grant Thornton addressed its audit report to the Company's Board and stockholders and conducted such audit and prepared such reports and letters with knowledge that the Company's management and directors were the intended recipients of such reports and letters and the Company's financial statements, that such audit was being conducted for their benefit, and that they would rely on such reports in connection with carrying out their responsibilities as managers and directors of the Company.

272.    Grant Thornton conducted its reviews of the Company's quarterly financial statements for the benefit of the Company's management, directors and shareholders.  Grant Thornton conducted such reviews with knowledge derived from its audits of the Company's annual financial statements and with knowledge that the Company's management, directors and shareholders were the intended recipients of the Company's quarterly financial statements, and that the Company's management and directors would rely on the quarterly financial statements in connection with carrying out their responsibilities as managers and directors.

273.    Grant Thornton owed to the Company, its management, and directors a duty to exercise that degree of due professional care, proficiency, and diligence required by professional standards.  This duty arose, in part, from its role as a certified public accountant and, in part, because Grant Thornton addressed its reports on the Company's financial statements to the Company's Board and because the Company's directors annually selected Grant Thornton as the auditor of the Company's financial statements.  Grant Thornton was able to foresee, and upon

information and belief, did foresee, that the Company's audited annual and quarterly reviewed financial statements would be relied upon by the Company's management, directors, and stockholders.

274.    Grant Thornton owed to the Company, its management and directors a duty of due care in connection with its audit and reviews of the Company's annual and quarterly financial statements.

275.    Grant Thornton read the Company's annual and quarterly reports to their shareholders, the Company's press releases announcing operating results, and all other public statements by the Company's management that incorporated or referenced all or portions of the Company's audited financial statements (*See* AU § 550 requiring the auditor to "read the other information and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the financial statements.").

276.    Grant Thornton owed to the Company a duty of due care to assure the Company and their officers and directors that:

(a)    The Company stated its financial statements accurately, completely and fully in compliance with GAAP and applicable SEC rules and regulations; and

(b)    The Company's management and directors were informed of those matters of which, under the circumstances pertaining to the Company, they should have been informed, as described herein.

277.    Grant Thornton negligently breached each of the duties described in the preceding paragraphs.

4840-9062-2784, v. 1

278.     Because of Grant Thornton's expertise in matters of accounting and auditing and other offered services, the Company relied on Grant Thornton to inform it of any financial or other matters that are the subject of the audit of a public company's financial statements or of the other offered services that would adversely affect the Company.

279.     With respect to the functions and services performed or rendered as described in the preceding paragraphs, Grant Thornton failed to exercise that degree of diligence and due care that the Company, its management and directors were entitled to expect of a professional services firm such as Grant Thornton. Grant Thornton breached these duties by having knowledge of the material misstatements or omissions or having failed to exercise reasonable due diligence which would have uncovered the misstated nature of the financial statements.

280.     But for Grant Thornton's negligence, the Company would not have suffered the substantial losses it did suffer and will continue to suffer, and such losses were the direct and proximate cause and the foreseeable consequence of Grant Thornton's negligence.

281.     As a direct and proximate result of Grant Thornton's negligence, the Company has suffered economic losses and continues to suffer economic losses in an amount to be determined according to proofs at trial.

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.     Against Defendant, Grant Thornton and in favor of the Company for the amount of damages sustained by the Company as a result of Grant Thornton's actions in an amount at least as much as Seventy-Five Thousand Dollars ($75,000.00);

B.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

C.      Awarding to the Company restitution from Defendant, Grant Thornton, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendant, Grant Thornton;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## COUNT VII

## CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

282.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

283.    By and through the wrongful acts and omissions described herein, Defendants have combined, associated, agreed, conspired, mutually undertaken and concerted together to commit a series of unlawful or tortious acts, as alleged in Counts I-VI of this Complaint, done in the furtherance of the conspiracy and used unlawful or tortious means to accomplish the negligent accounting as alleged herein for the purpose of willfully and maliciously injuring the Company in its reputation, trade and business.

284.    By and through the wrongful acts and omissions described herein, Defendants have attempted to procure the participation, cooperation, agreement or other assistance of other persons to enter into a combination, association, agreement, mutual understanding or concert to commit a series of wrongful acts that led to the negligent accounting as alleged herein for the purpose of willfully and maliciously injuring the Company in its reputation, trade and business.

285.    The acts and omissions of Defendants complained of in this Count have been undertaken in order to serve Defendants' respective personal pecuniary interests.

286.    The acts and omissions of Defendants complained of in this Count have been undertaken without justification.

287.    The Company has been injured as a direct and proximate result of the acts and omissions complained of herein, and it has suffered damages in an amount to be determined at trial.

288.    The acts and omissions of Defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly the Company is entitled to recover punitive damages with respect to this Count.

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' actions in an amount at least as much as Seventy-Five Thousand Dollars ($75,000.00), including punitive damages in an amount to be determined;

B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

C.    Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues in this case triable by a jury.

Dated: January 17, 2017

Respectfully submitted,

_/s/ Cynthia L. Leppert_

Cynthia L. Leppert (Bar Number 05857)
**NEUBERGER, QUINN, GIELEN, RUBIN &
GIBBER, P.A.**
One South Street, 27th Floor
Baltimore, MD 21202
Telephone: (410) 332-8554
Facsimile: (410) 332-8594
Email: CLL@NQGRG.com

**_Attorney for Plaintiffs and Proposed Liaison
Counsel for Plaintiffs_**

_Of Counsel:_

_/s/ William B. Federman_

William B. Federman
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
Email: wbf@federmanlaw.com

_/s/ Thomas J. McKenna_

Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGLESTON**
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

**_Attorneys for Plaintiffs and Proposed
Co-Lead Counsel for Plaintiffs_**
(Mr. McKenna has been admitted _Pro Hac Vice;_
Mr. Federman's Motion to Appear _Pro Hac Vice_ will be filed)